**In re Gary N. STEDMAN and June D. Stedman, Debtors.**

**Bankruptcy No. 87–05149.**

United States Bankruptcy Court, D. North Dakota.

March 2, 1987.

Jon Brakke, Fargo, N.D., for FLB.

Bruce Bohlman, Grand Forks, N.D., for debtors.

Wayne Drewes, Fargo, N.D., trustee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is a Motion To Dismiss Or In The Alternative Motion To Lift Stay, filed by Federal Land Bank of St. Paul (FLB) on February 13, 1987, one day following the date the debtors, Gary and June Stedman (Debtors), filed their Chapter 12 petition. The Debtors had previously been in Chapter 11, with their case being dismissed during the summer of 1986. FLB alleges that the Debtors do not qualify as family farmers because their debts exceed the $1,500,000.00 limitation, and that the Debtors' current petition was filed in bad faith. The Debtors resisted the motion and a hearing was held before the undersigned on February 19, 1987, at

which time the court found the facts to be as follows:

## Findings of Fact

The Debtors are obligated to FLB pursuant to a promissory note dated March 31, 1979, in the sum of $525,000.00. This obligation is secured by a substantial amount of farm and ranch land currently owned by the Debtors. But for the Debtors' first payment due in consequence of the March 31, 1979 note, the Debtors have been unable to meet scheduled obligations on the note, and consequently FLB and the Debtors have entered into various extensions and reamortizations of the note, both voluntarily and in the context of various court proceedings. The Debtors' most recent default has occurred because weather conditions did not permit the Debtors to harvest their sunflower crop. Consequently, the source of income which the Debtors anticipated using to pay FLB is standing in the field. The Debtors hope to harvest the sunflowers when weather conditions permit.

The following is a list of the Debtors' outstanding debts as computed by the Debtors, and by FLB respectively:

|  | Debtors | FLB |
|---|---|---|
| Commodity Credit Corp. | $ 129,039.73 | $ 171,777.25 |
| Federal Land Bank | $ 908,235.48 | $ 938,970.17 |
| First State Bank | $ 353,928.28 | $ 356,805.76 |
| First American Bank | $ 1,657.92 | $ 1,657.92 |
| GMAC | $ 1,989.01 | $ 1,989.01 |
| John Deere Finance Co. | $ 17,159.51 | $ 17,159.51 |
| Real estate taxes | $ 8,291.35 | $ 8,291.35 |
| Unsecured creditors | $ 54,814.63 | $ 54,814.63 |
| Total | $1,475,115.91 | $1,551,465.60 |

From the compilations we see a discrepancy of $76,350.00, stemming from differences in obligations to FLB, First State Bank and CCC. Whether the Debtors meet the definitional requirements depends upon the accuracy of the aggregate debt compilations. Accordingly, each of the discrepancies will be discussed.

■ FLB's attorney, Jon Brakke, by Affidavit dated February 13, 1986, stated that the Debtors' outstanding debt to FLB was $934,485.48. However, at trial an officer of FLB testified that Federal Land Bank's claim is $938,970.17, when adjusted for costs and attorney's fees recently incurred in the amount of $4,484.69. The Debtors have not yet been notified or billed for the $4,484.69, and consequently this court believes that the balance of FLB's note as of the date of filing was $934,485.48. The Debtors also have stock in FLB in the amount of $26,250.00. When customers borrow money from FLB, they are required to purchase a certain amount of stock in the company, which is added on to the customer's obligation to FLB, and interest is paid thereon throughout the duration of the customer's payments to FLB. FLB considers the stock a liability. Once a customer's obligation to FLB is paid down to the value of the stock, the stock is generally used to offset the remaining indebtedness. The Debtors, however, believe that the value of the stock should be subtracted from the outstanding obligation owed to FLB in arriving at total indebtedness to FLB. Thus, the obligation to FLB as listed on the Debtors' computation includes the FLB debt of $934,485.48, less the value of outstanding stock owned by the Debtors.

■ A minor discrepancy also exists between what the Debtors and FLB believe to be the amount of debt due First State Bank. The amount of debt to First State Bank as alleged by the Debtors currently, and in their petition, is $353,928.28. This is also the amount listed in the affidavit of attorney Brakke. The court is unclear as to how FLB arrived at its alleged indebtedness to First State Bank in the amount of $356,805.76. However, the court believes that the proper debt for purposes of this hearing is $353,928.28.

The Debtors, as do many farmers, use the Agriculture Stabilization and Conservation Service (ASCS) Commodity Credit Corporation (CCC) as a tool to market the commodities grown on their farm. The CCC sets loan rates on various crops which serves to act as a floor price when farmers market their crops. For example, if the local market rate for barley is a $1.25 per bushel, and the CCC loan rate is $1.50 per bushel, a farmer may elect to "seal" a specific amount of grain with CCC and receive a payment of $1.50 per bushel for the amount sealed. In actuality, a farmer

receives a loan of $1.50 per bushel for all grain that is sealed and uses the grain as collateral for the loan. When the loan matures several months later, the farmer may either elect to pay back the loan plus interest, forfeit the grain to the CCC in full satisfaction of the indebtedness, or pay off the loan with PIK certificates. Forfeiture of the grain to CCC will satisfy the entire obligation unless the grain has gone out of condition, or the estimate of bushels pledged as security was more than the amount of actual bushels in existence, in which case the farmer will be required to make up the deficiency only to the extent of the shortage of bushels. June Stedman testified that the Debtors do not consider their arrangement with CCC to be a debtor/creditor obligation. The Debtors have never had grain go out of condition, and therefore become unsatisfactory for use in satisfying the CCC loans.

Normally, farmers store the CCC grain on their property. This is the case with the Debtors. When the Debtors wish to move the grain on loan with CCC, the farmers must obtain authorization from CCC. This authorization is valid for 15 days. If the grain is not moved within that period, an extension or new authorization must be obtained. In February, the Debtors decided to obtain authorization from CCC to move some grain from their farm to various elevators. June Stedman testified that the Debtors chose to move the grain for two reasons: (1) because the market rate of the grain was above the loan rate, thus enabling the Debtors to sell the grain, pay off the loan obligation to CCC, and make a small profit for doing so, and (2) because the grain was stored on the ground, and CCC regulations required that the grain be put under cover within 90 to 120 days after being placed on the ground.

On February 3, 1987, marketing authorizations were issued for the Debtors' barley and a marketing authorization was issued on February 12, 1987 for their wheat. A substantial amount of grain was hauled to local elevators by February 12, 1987. While checks for this grain drawn on the various elevators were dated February 12, 1987, and mailed to CCC on that date, the checks did not arrive at the local ASCS office until sometime later. The Debtors' obligation to CCC on the loans was not reduced in consequence of the checks issued for sale of grain until February 17 and February 18. As of February 12, 1987, the CCC records indicated an outstanding obligation from the Debtors of $171,770.25, as listed by FLB. As of February 18, 1987, that amount had been reduced to $129,039.73 as listed by the Debtors.

### Conclusions of Law

The newly enacted Chapter 12 of the Bankruptcy Code is legislation for the adjustment of debts of a family farmer with regular annual income. For purposes of Chapter 12, a family farmer is defined in part as follows:

(A) Individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000.00 . . . .

11 U.S.C. § 101(17).

"Debt" is defined in the Bankruptcy Code as "liability on a claim." 11 U.S.C. § 101(11).

"Claim" is defined in the Bankruptcy Code as a "right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . .". 11 U.S.C. § 101(4).

■ The Debtors contend that, in determining their indebtedness to FLB, this court should deduct the value of their stock in FLB from the principal and interest due in consequence of the promissory note to FLB. When the Debtors borrowed money from FLB they were required, by law, to purchase FLB's stock. 12 U.S.C.A. § 2051 (1986). Indebtedness incurred in purchasing the stock was added on to the principal monies borrowed by the Debtors, and were included in the total amount of debt amortized. FLB has a first lien on the stock for the payment of the indebtedness owed it by the Debtors. 12 U.S.C.A. § 2054 (1986). FLB stock "shall be retired and paid at book value . . . as determined by the associ-

ation, upon the full repayment of the loan and if the loan is in default may be cancelled for application on the loan ...". 12 U.S.C.A. § 2034(a) (1986).

FLB's normal procedure for retiring stock is apparently to offset the stock against remaining indebtedness, when the balance of the indebtedness to them is reduced to the value of the stock. However, if an FLB association becomes insolvent, borrowers who pay off their loan obligations may well not recover the value of the stock held in FLB. *See Byrne v. Federal Land Bank of St. Paul,* 61 N.D. 265, 237 N.W. 797, 803 (1931). Customers of Federal Land Bank, such as the Debtors, are obligated for the entire amount of their indebtedness, and the stock is simply an equity interest which the customers have in FLB. Thus, the Debtors were obligated to Federal Land Bank in the amount of $934,-485.48 as of February 12, 1987, the petition date.

■ The other remaining issue in dispute is the amount of indebtedness the Debtors owed CCC as of the date of filing. Many farmers, including the Debtors, who "seal" grain to the CCC as collateral in return for a loan on the grain, do not consider their relationship to be that of a debtor-creditor. Nevertheless, the legal relationship is clearly such that the Debtors are indebted to CCC in consequence of loans obtained from CCC. *See In re Martin,* 761 F.2d 472 (8th Cir.1985). *See also* 7 C.F.R. § 1421.1 (1986) ("Farm storage loans [are] evidenced by notes and secured by security agreements"). The major issue in contention, however, is the date when the Debtors' indebtedness to CCC was reduced as a result of the Debtors selling the grain secured to CCC and using the proceeds to pay back the loans against the grain.

The following language obtained from CCC regulations lends some guidance in resolving this issue:

> A producer may at any time obtain the release of all or any part of the commodity remaining as loan collateral by paying to CCC the principal amount of the loan which is outstanding with respect to the

quantity of the commodity released, plus interest....

> When the proceeds of the sale of the commodity are needed to repay a farm storage loan, the producer must request and obtain prior written approval of the county ASCS office on a form prescribed by CCC in order to remove a specified quantity of the commodity from storage ....

> Any such approval shall not constitute a release of CCC's security interest in the commodity or release a producer from liability for any amounts due and owing to CCC with respect to the loan indebtedness if full payments of such amounts is not received by the county ASCS office ....

> The note and security agreement *shall not be released until the loan has been satisfied in full.*

7 C.F.R. § 1421.18(b) (1986).

When producers, such as the Debtors, choose to liquidate a farm storage loan, they are required to either pay off the loan, or deliver to CCC a sufficient quantity of the eligible commodity having a price support value equal to or greater than the outstanding balance of the loan. 7 C.F.R. § 1421.19 (1986). The grade, quality and quantity of the commodity delivered by the producer are all considered in determining value of the collateral and settling loan obligations with CCC. 7 C.F.R. § 1421.22 (1986).

■ In the case at bar, by February 12, 1987, the Debtors had hauled a substantial portion of grain, authorized by CCC for removal, to local elevators. In fact, checks issued by local elevators in consequence of these deliveries and sales were issued by the elevators to CCC on February 12, 1987. However, the facts clearly indicate that CCC did not receive the checks until some date thereafter, and the payments were not credited to the Debtors' account with CCC until February 17 and 18. The Debtors argue that, for all practical purposes, they had completed their obligations as of February 12, 1987, and that is the date which obligations to CCC in consequence of the said grain should be discharged. The

Debtors may consider their obligation to CCC discharged once grain is hauled to local elevators, and checks are issued. However, from a legal standpoint, this is not the case. Until CCC actually receives payment for the sale of grain under loan to it, the obligations are not discharged. This is no different than when a farmer sells grain, which is mortgaged to a local lending institution. A lending institution does not reduce a farmer's indebtedness to it upon hearing that the farmer has hauled the mortgaged grain to a local elevator. Indebtedness is only reduced when proceeds from sale of the grain are tendered to the lending institution.

From the foregoing analysis, the court concludes that as of the date of filing, February 12, 1987, the Debtors held indebtedness in the following amount:

| | |
|---|---|
| Commodity Credit Corporation | $171,777.25 |
| Federal Land Bank | $934,485.48 |
| First State Bank | $353,928.28 |
| First American Bank | $1,657.92 |
| GMAC | $1,989.01 |
| John Deere Finance Company | $17,159.51 |
| Real estate taxes | $8,291.35 |
| Unsecured creditors | $54,814.63 |
| Total | $1,544,103.43 |

Chapter 12 was enacted by Congress as a tool for family farmers to use in reorganizing their business and financial affairs so as to weather the pending financial crisis in much of rural America. However, Congress made it clear that Chapter 12 was not to apply to all farming operations, of whatever size. One of the restrictions which Congress incorporated into Chapter 12 was that a farming operation with in excess of $1,500,000.00 of indebtedness would not constitute a family farm, and thus, would not be eligible for Chapter 12 relief. The court is cognizant of the Stedman's farming operation, and considers their operation to be a family farm operation, as the term family farm is commonly used by laymen. However, their operation does not meet the stringent guidelines which Congress has placed on farms eligible for Chapter 12 relief, and the court cannot ignore the rather specific criteria which Congress has established for those seeking Chapter 12 relief. The Eighth Circuit has made it abundantly clear, that the strict letter of the law will be applied when considering eligibility for relief under the Bankruptcy Code. *See Basin Electric Power Co-op. v. Midwest Processing Co.*, 769 F.2d 483, 485 (8th Cir. 1985). Obviously, if Congress intends that Chapter 12 relief be available only to those meeting specific criteria, this criteria must be strictly enforced.

As of February 12, 1987, the date of the Debtors' Chapter 12 petition, their indebtedness was $1,544,103.43. Thus, the Debtors indebtedness exceeded $1,500,000.00 and they were ineligible for Chapter 12 relief at that time. If, at some point, the Debtors' indebtedness is reduced below the $1,500,000.00 limitation, they may file a new Chapter 12 petition.

Accordingly, and for the reasons stated herein, the Chapter 12 petition of Gary and June Stedman, filed February 12, 1987, is herein and in all things DISMISSED without prejudice.

IT IS SO ORDERED.