**In re Thomas M. QUINTANA and Delores J. Quintana, Debtors.**

**Thomas M. QUINTANA and Delores J. Quintana, Appellants,**

**v.**

**INTERNAL REVENUE SERVICE, BUREAU OF LAND MANAGEMENT, Clemons, Cosho & Humphrey, Norman**

**Easterday, Farm City Livestock Supply, Connecticut General Life Insurance Company, et al., Appellees.**

**BAP No. ID 87–1946 VPR.**

**Bankruptcy No. 87–01240–F.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted June 15, 1988.

Decided Oct. 27, 1989.

Richard B. Eismann, Caldwell, Ind., for appellants.

Clifton R. Jessup, Jr., Dixon, Dixon, P.C., Omaha, Neb., for appellees.

## OPINION

Before VOLINN, PERRIS and RUSSELL, Bankruptcy Judges.

BARRY RUSSELL, Bankruptcy Judge:

The debtors' Chapter 12 case was dismissed because their aggregate debts exceeded the statutory limitations for eligibility to file a Chapter 12 petition. The bankruptcy court rejected the debtors' argument that, for eligibility purposes, the value of a nonrecourse obligation should be written down to the value of the collateral. The court also rejected the debtors' argument that their aggregate debts should be reduced by a counterclaim that the debtors had asserted against a creditor. We affirm.

## I. FACTS

In May 1979, the debtors Thomas M. and Delores J. Quintana borrowed $1 million from Connecticut General Life Insurance Company. The loan was secured by real property in Idaho. On March 8, 1985, after the debtors defaulted on both notes, Connecticut General brought an action in Idaho state court for a money judgment and for a decree of foreclosure and order of sale of its interest. The debtors answered and counterclaimed, alleging that Connecticut General had wrongfully procured the appointment of a receiver to conduct the debtors' business, and that the receiver had damaged the debtors' business by acting in a reckless and grossly negligent manner while acting as an agent of Connecticut

General. The debtors sought compensatory damages in the amount of $75,000 and punitive damages in the amount of $1 million on their counterclaim.

On September 10, 1986, the Idaho state court entered summary judgment in favor of Connecticut General and declined to enter summary judgment on the debtors' counterclaim, stating that it presented genuine issues of material fact. During the proceedings, Connecticut General waived its right to subsequently pursue a deficiency judgment against the debtors.

On April 17, 1987, the Quintanas filed a Chapter 12 petition. Connecticut General moved to dismiss the case on the grounds that the debtors' aggregate debts exceeded the statutory limitation of $1.5 million and that the debtors were therefore ineligible to file a Chapter 12 petition. On July 6, 1987, the bankruptcy court held a hearing, found that the Quintanas' aggregate debts exceeded $1.5 million, and dismissed the case.

The debtors timely appealed. On appeal, it is not disputed that Connecticut General has a claim for an amount in excess of $1.5 million. It is also not disputed that for these purposes the value of the property is about $600,000, an amount substantially less than $1.5 million.

## II.  ISSUE

Whether the debtors' aggregate debts exceeded $1.5 million in view of Connecticut General's waiver of a deficiency judgment and in view of the debtors' counterclaim against Connecticut General.

## III.  STANDARD OF REVIEW

The facts are not in dispute. On appeal is the definition and application of the term "aggregate debts," as used in Section 101(17)(A).[1] "Questions of statutory interpretation are reviewed de novo." *Sierra*

1. All citations are to Title 11, U.S.C., unless otherwise noted.

2. Although the statute does not explicitly state when the eligibility requirement concerning the debt-ceiling limitation is to be determined, it does state that the second element is to be determined "on the date the case is filed." That

*Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 707 (9th Cir.1986).

## IV.  DISCUSSION

■ Section 109 contains the statutory limits on "Who may be a debtor." Subsection (f) states that "Only a family farmer with regular annual income may be a debtor under Chapter 12 of this title." Family farmer is defined along with certain other terms in Section 101. A family farmer is defined as an

individual or *individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000* and

not less than 80 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse,

and

such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed.

11 U.S.C. § 101(17)(A) (emphasis and formatting added). The element of the statutory definition that is at issue in this appeal is that to qualify as a family farmer, a debtor's aggregate debts must not exceed $1.5 million on the date that the petition is filed.[2] *See also* § 101(17)(B)(ii) (the same $1.5 million debt ceiling applies when the petitioner is a corporation or a partnership).

date is the logical date to be used for these purposes also. *In re Carpenter,* 79 B.R. 316, 320 (Bankr.S.D.Ohio 1987); *In re Labig,* 74 B.R. 507, 509 (Bankr.S.D.Ohio 1987); *In re Orr,* 71 B.R. 639, 641 n. 4 (Bankr.E.D.N.C.1987). Thus, the debtor must meet the eligibility requirements on the date the petition is filed.

■ The phrase "aggregate debts," as used in Section 101(17)(A), is the most inclusive phrase used in the Bankruptcy Code in regards to aggregations of debts. Chapter 12's debt-ceiling limitation is not defined in terms of aggregate "noncontingent, liquidated debts," as Chapter 13's eligibility requirements are defined, nor is it defined in terms of claims that are "not contingent as to liability or the subject of a bona fide dispute," as eligibility for a creditor to file an involuntary petition is defined. *Compare* § 101(17)(A) *with* § 109(e) and § 303(b)(1). Two different definitions of debts are used within Section 101(17)(A) itself. "The $1,500,000 limitation refers to 'aggregate debts,' a term which is much broader than the 'aggregate, noncontingent, liquidated debts' language used in connection with the 80% test." 3 *Norton Bankruptcy Law and Practice* § 81.02 at 2 (1988). Thus, the term "aggregate debts" excludes fewer types of debts than the other more limited terms. In fact, the term "aggregate debts" includes *all* types of debts.

■ A debt is defined in Section 101(11) as "liability on a claim." A claim is broadly defined in Section 101(4) to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." The legislative history to Section 101(4) emphasizes the broad definition of "claim" and states that "[b]y this broad definition ... the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 21–22 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5807–08, 6266. A relevant example of how broadly the term "claim" has been interpreted may be found in *Downey Sav. & Loan Ass'n v. Metz (In re Metz)*, 820 F.2d 1495 (9th Cir.1987), where the Ninth Circuit held that a lien on property of the debtor

was a claim against the debtor that could be dealt with by a Chapter 13 plan even though the debtor's *in personam* liability had been discharged in a prior Chapter 7. *Id.* at 1498.

The term "debt" has the same broad meaning as the term "claim." *See, e.g., In re Vaughan*, 100 B.R. 423 (Bankr.S.D.Ill. 1989). The legislative history to Section 101(11) states that "[t]he terms [debt and claim] are coextensive: a creditor has a 'claim' against the debtor; the debtor owes a 'debt' to the creditor." H.R.Rep. No. 95–595 at 310; S.Rep. No. 95–989 at 23, U.S.Code Cong. & Admin.News 1978, pp. 5809, 6267. *In re Johnson–Allen*, 871 F.2d 421, 424 (3rd Cir.1989). The term "coextensive" in the legislative history clearly suggests that both terms have the same scope.[3] *E.g., Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1219 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). Any difference between the two definitions are merely those differences inherent in describing a term from opposing points of view. "Debt" concerns itself with a debtor's obligation, while "claim" concerns itself with a creditor's rights. *In re Pulliam*, 90 B.R. 241, 245 (Bankr.N.D.Tenn. 1988). Thus, a debt is coextensive with a claim. To the extent that a creditor has a claim against the debtor, the debtor owes a debt to the creditor.

We recognize the authority supporting the dissent's position that the term "debt" is narrower than the term "claim" and that liability on the claim must be established or unchallenged before a claim becomes a debt. *See, e.g., In re Lands*, 85 B.R. 83 (Bankr.E.D.Ark.1988); *In re Carpenter*, 79 B.R. 316 (Bankr.S.D.Ohio 1987); *In re Lambert*, 43 B.R. 913 (Bankr.D.Utah 1984). We believe however that this position is inconsistent with the command of the legislative history that the claims be construed coextensively.

■ It is a general rule of statutory construction that a term should be construed consistently throughout a statute.

---

**3.** Although some authorities have characterized this language as imprecise, *see In re Pearson*,

773 F.2d 751, 755 (6th Cir.1985), we disagree with this characterization.

*See Yamaguchi v. State Farm Mutual Automobile Insurance Co.,* 706 F.2d 940, 947 (9th Cir.1983). This is particularly true where, as here, Congress has taken the effort to provide a definition applicable to the entire Bankruptcy Code. The narrow definition of the term debt is inconsistent with the application of that term in other sections of the Code [4] and may have drastic consequences if that definition is applied in other sections of the Code that use the term "debt" in an unrestricted manner. For example, sections 727(a), 1141(d), 1228(c) and 1328(c) provide that a discharge or confirmation of a plan discharges a debtor from all "debt[s]." If the term "debt" is limited to unchallenged or established liabilities, as suggested by some of the cases cited in the prior paragraph, à discharge would be limited in scope and the fresh start purposes of the Bankruptcy Code would be significantly impaired. If the term is limited to liability on allowed claims, as the dissent implies, the impairment would be more severe.[5]

Finally, cases which define the term "debt" narrowly in the context of a Chapter 12 eligibility determination, *see In re Williams Land Co.,* 91 B.R. 923, 927 (Bankr.D.Or.1988); *Lands, supra; Carpenter, supra,* rely primarily on cases determining Chapter 13 eligibility. *See In re Lambert, supra, In re King,* 9 B.R. 376 (Bankr.D.Or.1981). *Lambert* and *King* involve determinations under section 109(e) which limits Chapter 13 eligibility to individuals with "noncontingent, liquidated, unsecured debts of less than $100,000." Those cases considered the relationship of "disputed" or similar terms to the terms "noncontingent" or "liquidated" and held that disputed debts could not be counted toward the $100,000 debt limitation. The issue in *Lambert* and *King* involved the interpretation of a section where the term "debt" was expressly restricted rather than the interpretation of a section where, as in this case, the term is unrestricted. In addition, the holdings of *King* and *Lambert* are inconsistent with *In re Sylvester,* 19 B.R. 671 (9th Cir. BAP 1982), where the Panel noted that the terms "disputed," "contingent" and "unliquidated" have different meanings and held that where the amount of the debt was readily ascertainable, the fact that the debt was disputed would not preclude its use in determining eligibility under section 109(e). If *Sylvester* refused to use the narrow definition in the context of a statutorily restricted application of the term debt, we will not do so here and we adopt the statute's broad definition of that term for purposes of determining Chapter 12 eligibility.

Although Connecticut General's proof of claim reflected a debt in excess of $1.5 million and an apparent ineligibility for Chapter 12 relief,[6] debtors argue that Con-

---

**4.** In *In re Sierra Steel, Inc.,* 96 B.R. 275 (9th Cir. BAP 1989), the Panel indicated that disputed or contingent liabilities must be included in determining total indebtedness for purposes of determining insolvency under section 547. The Panel also noted in *Sierra Steel* that contingent debts must be reduced to reflect their present or expected amount. Other courts have recognized the appropriateness of reducing disputed or contingent debts to reflect the possibility that liability will not be established or a contingency will not come to pass in determining the amount of debt for purposes of determining insolvency. *See In re Kucharek,* 79 B.R. 393 (Bankr.E.D.Wisc.1987). Because the debt in this case is undisputed, we need not determine whether it would be appropriate in analyzing Chapter 12 eligibility to so limit the amount of the debt on the basis of the probability that liability will not be established or that the nonoccurrence of a contingency will prevent a liability from coming to fruition.

**5.** Apparently to avoid situations like this, *In re Lambert, supra,* suggests that the term "debt" may have different meanings for different sections of the code. However, Congress provided one definition for this term, which it made applicable to the entire title. Moreover, section 109(e) and other such sections indicate, Congress knew how to restrict the meaning of debt if it chose to do so to provide a different meaning for different sections.

**6.** The debtors' schedules should be the starting point to a determination of the debtor's aggregate debts. A Chapter 12 petition was properly dismissed in *Reiners v. Federal Land Bank of Jackson (In re Reiners),* 846 F.2d 1012 (5th Cir. 1988), when it was "undisputed that the aggregate debt reflected on the face of the Reiners' petition was greater than $1.5 million." *Id.* at 1013. The Quintanas' schedules do not reflect aggregate debts greater than $1.5 million. However, the schedules are not dispositive. If the debtors' schedules were dispositive, then eligi-

necticut General's claim is not, in its entirety, a debt that should be considered in determining Chapter 12 eligibility. Debtors argue that the entire amount of Connecticut General's nonrecourse claim against the property is not a debt and that the amount of their aggregate debts should be reduced by the value of their counterclaims against Connecticut General. For the reasons set forth below, we disagree.

A. *A Nonrecourse Claim Against The Property Of The Debtors Should Be Treated As A Claim Against The Debtors Personally For Eligibility Purposes.*

The main issue present in this appeal is whether Connecticut General's claim should be valued at its full amount or at some lower value based on the amount that Connecticut General is likely to receive in collection on it. This issue arises due to Connecticut General's waiver of its right to pursue a deficiency judgment. The debtors assert that the value of Connecticut General's claim should be valued at the value of the land, because they are no longer personally liable for any deficiency. This issue is important because if this debt were valued at only $600,000 instead of $1.5 million, then the debtors would no longer violate Chapter 12's debt-ceiling limitation.

■ Debtors' argument, however, ignores Section 102(2), one of the Bankruptcy Code's basic rules of construction, which provides that a claim against property of the debtor is treated as a claim against the debtor personally. Pursuant to Section 103(a), that rule of construction applies to a case under Chapter 12. The legislative history reflects that Section 102(2) squarely addresses the issue before this panel.

This paragraph [Section 102(2) ] is intended to cover nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally. Thus, such an agreement would give rise to a claim that would be treated as a claim against the debtor personally, for the purposes of the Bankruptcy Code.

H.R.Rep. No. 95–595 at 315; S.Rep. No. 95–989 at 28, U.S.Code Cong. & Admin. News 1978, pp. 5814, 6272.

■ The obligation at issue in this appeal was personally created by the Quintanas. Even though Connecticut General has waived its right to pursue the remedy of a deficiency judgment, under section 102(2) the claim against the property is a claim against the debtors. Because the term claim is coextensive with the term debt, this obligation is a debt of the debtors which is defined by the amount of the claim against the property. Connecticut General's claim against the property is approximately $1.528 million because it has the right to payment of that amount from the property or from the proceeds of the sale of the property. Although, as a practical matter, Connecticut General will only be able to collect the value of the property, it has the right to payment of the entire obligation if under some circumstance, the property is sold for more than its present value.[7] Therefore, although the collectability may be limited to the value, the right to payment is not so limited and consequently neither is the claim, nor the debt. Accordingly, notwithstanding the non-recourse nature of the obligation, the entire debt is to be considered in computing aggregate debts.

B. *The Amount Of The Quintanas' Aggregate Debts Should Not Be Reduced By The Value Of Any Of Their Assets, Including Their Counterclaim.*

■ The debtors argue that they should be allowed to set-off their counterclaim against their debt to Connecticut

---

bility could be created by improper or incomplete scheduling of creditors. A bankruptcy court should "look past the schedules to other evidence submitted when a good faith objection to the debtor's eligibility has been brought by a party in interest." *In re Williams Land Co.,* 91 B.R. 923, 927 (Bankr.D.Or.1988).

7. For example, if the property is sold under section 363, Connecticut General could bid the full amount of its obligation at the sale. 11 U.S.C. § 363(k).

General. However, eligibility is simply defined in terms of aggregate debts, and not in terms of "net" aggregate debts. The Bankruptcy Appellate Panel has held that, for the purpose of determining eligibility for a Chapter 13, the amount of debt should not be reduced by the value of a counterclaim asserted by the debtor. *Sylvester v. Dow Jones & Co. (In re Sylvester)*, 19 B.R. 671, 673 (9th Cir. BAP 1982).

The debtors' desire to set-off their counterclaim against their debt to Connecticut General is no different from any other attempt to set-off, with the added practical difficulty inherent in the valuation of an unliquidated counterclaim. The analysis is similar: a counterclaim, if it has some value, is an addition to assets of the estate and not a reduction to its liabilities. The term "aggregate debts" should not be interpreted as aggregate debts less certain assets. *In re Sylvester*, 19 B.R. at 673. *See also In re Stedman*, 72 B.R. 49, 53 (Bankr.D.N.D.1987) (Chapter 12 debtors were not allowed to set-off the Federal Land Bank stock that they had been required to purchase as a precondition to incurring debt to the Federal Land Bank against the debt that they did owe to the Bank).[8]

### C. The Debt–Ceiling Limitation Should Be Enforced As Written.

It appears that the Quintanas might be family farmers in every definition of the phrase except for the definition provided by the Bankruptcy Code because the Quintanas fall just beyond the line that Congress drew for eligibility to file a Chapter 12. However, the line is where Congress placed it.

It is not necessarily "inequitable" if the Quintanas do not qualify to file under Chapter 12 because it was never expected that every single family that farms and that wants to file for bankruptcy would be eligible to file a Chapter 12 petition. "It was estimated that 90% of farmers would be eligible for Chapter 12 treatment, based on its $1.5 million debt-limit ceiling." 5 Bkr–L Ed., *Code Commentary & Analysis* § 44.1:2 at 7 (1987) (citations omitted). "Congress made it clear that Chapter 12 was not to apply to all farming operations, of whatever size." *In re Stedman*, 72 B.R. at 54. *See also Norwest Bank Worthington v. Ahlers (In re Ahlers)*, 485 U.S. 197, 210 n. 9, 108 S.Ct. 963, 970 n. 9, 99 L.Ed.2d 169 (1988) (*dicta;* the Ahlers, who were family farmers in the lay sense of the term, did not qualify for Chapter 12).

Even assuming *arguendo* that it is somehow "inequitable" for these debtors not to qualify to file a Chapter 12 petition, "[w]e have serious doubts ... about the propriety of judges' declining to enforce statutes that produce inequitable results. Bankruptcy statutes are not special cases." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir.1988) (citations omitted). Underinclusive legislation, such as Chapter 12, is still valid legislation and should be enforced as written.[9]

Liberal interpretation of the statute in

8. Even if the debtors' argument were to be accepted, that the amount of aggregate debts should be reduced by the value of their counterclaim, the counterclaim must first satisfy a threshold test for merit. *In re Carpenter*, 79 B.R. 316, 319–20 (Bankr.S.D. Ohio 1987). The Quintanas' counterclaim does not pass such a threshold test. The bankruptcy court noted that the counterclaim "appears to be of questionable merit, particularly the claim for $1 million punitive damages." *In re Quintana*, No. 87–01240F, slip op. at 3 n. 3 (Bankr.D. Idaho Aug. 14, 1987) (Order of Dismissal). In addition, some evidence of the debtors' own opinion of the merits of their counterclaim is provided by noting that the debtors chose to omit their counterclaim when they scheduled, under penalty of perjury, the assets of their estate.

9. It has been said that Chapter 12, as emergency legislation in response to the farm financing crisis, is a novel program that might be in need of refinement. 132 Cong.Rec. S15,075 (daily ed. Oct. 3, 1986) (remarks of Sen. Thurmond); *id.* at S15,092 (remarks of Sen. DeConcini). Such refinement may be needed to prevent the exclusion of these family farmers from bankruptcy relief under Chapter 12. However, that is a matter for Congress to consider and for not the courts. "[R]elief from current farm woes cannot come from a misconstruction of the applicable bankruptcy laws, but rather, only from action by Congress." *Norwest Bank Worthington v. Ahlers (In re Ahlers)*, 485 U.S. 197, 209, 108 S.Ct. 963, 970, 99 L.Ed.2d 169 (1988).

the manner suggested by the debtors,[10] should not be used to circumvent the plain meaning of the statutory language. Chapter 12's debt-ceiling limitation has been uniformly interpreted in accordance with the way the ordinary language of the statute. *Reiners v. Federal Land Bank of Jackson (In re Reiners)*, 846 F.2d 1012, 1013 (5th Cir.1988).[11]

## V. CONCLUSION

Congress has defined and limited eligibility to file a Chapter 12 petition in such a fashion as to exclude some who appear to be family farmers in the lay sense of the phrase. That is the prerogative of the legislature.

These debtors do not qualify to file a petition under Chapter 12 because they have more than $1.5 million in aggregate debts. Their debts may not be reduced merely because Connecticut General waived its right to pursue a deficiency judgment; nor may their debts be reduced by a counterclaim against a creditor.

One of the substantial benefits available to Chapter 12 debtors is the ability to write down an undersecured debt to the value of the land used as collateral and, at the same time, to keep the land. Presumably, this is the Quintanas' goal. However, only those debtors who qualify for relief under Chapter 12 may enjoy any of its substantial benefits. Specifically, Chapter 12 has a debt-ceiling limitation that must be met before a petitioner is allowed to enjoy the

benefits of Chapter 12, such as writing down secured debt. The test for eligibility "is simply described and should be simply applied." *Whaley v. United States (In re Whaley)*, 76 B.R. 95, 97 (N.D.Miss.1987).

We affirm the dismissal of the petition.

VOLINN, Bankruptcy Judge, dissenting:

## A. RULING OF THE BANKRUPTCY COURT

The decision of the bankruptcy court was considered in the context of state law. Idaho is a state which follows the lien theory of mortgages. Because the mortgagee under Idaho law does not have legal title to the mortgaged premises and the mortgagor retains full ownership of the property, the mortgagee's interest in the property is that of a lienholder or holder of a security interest. *Birkeland v. Clearwater Concentrating Co.*, 64 Idaho 122, 127 P.2d 1047, 1051 (1942); *Hannah v. Vensel*, 19 Idaho 796, 116 P. 115, 117 (1911). Therefore, the mortgagee must institute foreclosure proceedings in the event of a default in order to sell the property.

Idaho Code § 6–101 is known as the "single action rule." A real property mortgagee in Idaho must foreclose first on its security before having recourse against a debtor. A deficiency exists where the proceeds of the foreclosure sale are insufficient to satisfy the mortgage debt.[1] The

---

**10.** Debtors support their argument that Chapter 12 should be liberally construed with citations to cases involving Section 75, the former farmer-relief section of the Bankruptcy Act of 1898. Agricultural Compositions and Extensions Act, 11 U.S.C. § 203 (enacted March 3, 1933, expired March 1, 1949). However, the Ninth Circuit has held that a court could not allow a case to continue under Section 75 with a debtor who did not meet the eligibility requirements. *McLaughlin Land & Livestock Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 122 F.2d 193 (9th Cir.), *cert. denied*, 314 U.S. 700, 62 S.Ct. 483, 86 L.Ed. 560 (1941). Although Section 75 may have been otherwise liberally construed, courts were constrained then as they are now, in that they cannot create eligibility where none has been granted by Congress.

**11.** *See also In re Williams Land Co.*, 91 B.R. 923, 927–28 (Bankr.D.Or.1988); *In re Carpenter*, 79

B.R. 316, 321 (Bankr.S.D. Ohio 1987); *In re Baldwin Farms*, 78 B.R. 143, 144 (Bankr.N.D. Ohio 1987); *In re Henderson Ranches*, 75 B.R. 225, 226 (Bankr.D.Idaho 1987); *In re Johnson*, 73 B.R. 107, 109 (Bankr.S.D. Ohio 1987); *In re Stedman*, 72 B.R. 49, 54 (Bankr.D.N.D.1987).

**1.** Section 6–101 provides for judicial foreclosure proceedings as follows:

There can be but one action for the recovery of any debt, or the enforcement of any right secured by mortgage upon real estate which action must be in accordance with the provisions of this chapter. In such action the court may, by its judgment, direct a sale of the encumbered property (or so much thereof as may be necessary) and the application of the proceeds of the sale to the payment of the costs of the court and the expenses of the sale, and the amount due to the plaintiff; and sales

amount of a deficiency judgment under Idaho law is limited to the difference between the property's fair market value and the amount of the unpaid debt.[2]

The judgment of foreclosure and sale determines the parties' legal rights in the underlying obligation, as well as in the mortgaged property. Thus, it determines the amount of the mortgage indebtedness, the default, the right of the mortgagee to realize upon the security, the time and place of sale of the security, the notice required, and the right of the mortgagee to a judgment of deficiency. Idaho Code §§ 6–101 & 6–108 (1979). If the mortgagee bids at the sheriff's sale, he does not acquire title to the property until judicial confirmation of the sale. Idaho Code § 6–104 (1979). Therefore, the deficiency is determined following confirmation of the sale.

From this premise, Connecticut General contended that when a judgment has been obtained but a sale has not yet taken place, as in this case, a deficiency is not yet in existence, and therefore it remains entitled to the mortgage indebtedness of $1,527,-861.89, regardless of its waiver of a deficiency. Connecticut General also argued that its waiver did not extinguish the debt, and that all it waived was the right to pursue a particular remedy—that of a deficiency judgment. The bankruptcy court agreed with the latter argument of appellee, holding that only the remedy, but not the debt, was affected by the waiver. Thus, the court concluded, in effect, that the mortgage debt should be considered as fully enforceable despite a factual context which, beyond sale of the collateral, rendered such debt unenforceable under the Idaho Code, particularly section 6–101 as herein noted.

## B. LEGISLATIVE POLICY UNDER THE BANKRUPTCY CODE

The Bankruptcy Code is to be liberally construed in order to give the debtor the full measure of the relief afforded by Congress. Any ambiguities should be resolved in favor of the debtor. *See Wright v. Union Central Ins. Co.*, 311 U.S. 273, 278–79, 61 S.Ct. 196, 199–200, 85 L.Ed. 184 (1940) (construing pre-Code .Bankruptcy Act provisions for relief of farmer-debtors). The court in Wright stated:

This Act provided a procedure to effectuate a broad program of rehabilitation of distressed farmers faced with the disaster of forced sales and an oppressive burden of debt. Safeguards were provided to protect the rights of secured creditors, throughout the proceeding, to the extent of the value of the property. There is no constitutional claim of the creditor to more than that. And so long as that right is protected the creditor certainly is in no position to insist that doubts or ambiguities in the Act be resolved in its favor and against the debtor. Rather, the Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress, lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and the letter of the Act.

*Id.* at 278–79, 61 S.Ct. at 199–200 (citations omitted).[3] For a recent application of this

---

of real estate under judgments of foreclosure of mortgages and liens are subject to redemption as in the case of sales under execution; (and if it appears from the sheriff's return that the proceeds are insufficient, *and a balance still remains due, judgment can then be docketed for such balance against the defendant or defendants personally liable for the debt), and it becomes a lien on the real estate of such judgment debtor, as in other cases on which execution may be issued.*
Idaho Code § 6–101 (1979) (emphasis added).

**2.** Statute governing deficiency judgments provides:

No court in the state of Idaho shall have jurisdiction to enter a deficiency judgment ... in any amount greater than the difference between the mortgage indebtedness, as determined by the decree, plus costs of foreclosure and sale, and the reasonable value of the mortgaged property, to be determined by the court in the decree upon the taking of evidence of such value.
Idaho Code § 6–108 (1979).

**3.** Several cases have held that the eligibility provisions of Chapter 12 are to be strictly construed. Such cases, however, invoked this principle only after determining the true debt amount to be in excess of $1,500,000. *In re*

principle, *see In re Lambert*, 43 B.R. 913, 919 (Bankr.D.Utah 1984), which held that the eligibility provisions of Chapter 13 "should be liberally interpreted so as not to unnecessarily obstruct the eligibility of debtors desiring relief...."

Similarly, present Chapter 12 of the Bankruptcy Code, encompassed in legislation entitled the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554, § 255, 100 Stat. 3105–3114, "was enacted by Congress as a tool for family farmers to use in reorganizing their business and financial affairs so as to weather the pending financial crisis in much of rural America." *In re Stedman*, 72 B.R. 49, 54 (Bankr.D.N.D.1987); *see also* 132 Cong. Rec. S15076–77 (daily ed. Oct. 3, 1986) (analysis of farmers' economic plight). Because Chapter 12 is a recent enactment, there is a consequent dearth of judicial interpretation. There can be little doubt, however, that Congress intended this statute to enlarge and liberalize a farmer's opportunity to enter into an arrangement with his creditors, particularly those who are secured, whereby he could try to effect a more favorable economic resolution of his problems. Congress found that Chapter 11, the only option for most family farmers, had been "needlessly complicated, unduly time-consuming, inordinately expensive and, in too many cases, unworkable." H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess. 48 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 5227, 5249. Present Chapter 12 is

> to be used only by family farmers. It is designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land. It offers family farmers the important protection from creditors that bankruptcy provides while, at the same time, preventing abuse of the system and ensuring that farm lenders receive a fair repayment.

.    .    .    .    .

*Labig,* 74 B.R. 507, 108–09 (Bankr.S.D. Ohio 1987) (husband and wife filed separate petitions, each listing one-half of their joint debts); *In re Stedman,* 72 B.R. 49, 54 (Bankr.D.N.D.

Under this new chapter, it will be easier for a family farmer to confirm a plan of reorganization.

*Id.*

### C. CLAIM VS. DEBT

A "family farmer" is eligible to file a petition for relief with the bankruptcy court under Chapter 12. The Code defines family farmer as an "individual or individual and spouse engaged in farming operations whose *aggregate debts* do not exceed $1,500,000...." 11 U.S.C. § 101(17)(A) (1982 ed. Supp. IV) (emphasis supplied). The issue before us is whether the foregoing aggregate may include any sum in excess of the present value of the property which is admittedly the sole source for payment of appellee's claim. Obviously, if the deficiency amount is included, the Quintanas' aggregate debts exceed the $1,500,-000 eligibility ceiling and they are not entitled to Chapter 12 protection. However, because of its waiver of deficiency, creditor Connecticut General has a right to payment of its secured claim not to the extent of $1,527,861.89 but only to the extent of the value of the property securing the claim, which, as of the filing of the Chapter 12 petition, was admittedly $600,000. Without bankruptcy, since its only recourse is to the property, the amount to which Connecticut General would have been entitled would rise (or fall) with fluctuations in the value of the property, such fluctuations being without relevance to what the debtor would owe. Therefore, characterizing the deficiency amount as contingent or unliquidated is not only inaccurate but does not dispose of the issue of whether it is a debt for Chapter 12 purposes, even though these types of liabilities are not statutorily excluded from the debt ceiling calculation in Chapter 12. 11 U.S.C. § 101(17)(A) (1982 ed. Supp. IV); *In re Carpenter,* 79 B.R. 316, 319–20 (Bankr.S.D.Ohio 1987); *see In re Lambert,* 43 B.R. 913, 919–23 (Bankr.D. Utah 1984) (defining noncontingent, liqui-

1957) (discrepancies between debtors' schedules and creditors' claims to be resolved most favorably to permit eligibility.)

dated, and disputed debts in eligibility context of Chapter 13 proceeding). The issue here is whether a waived deficiency may rise to a level of existence consistent even with the concept of an unliquidated or contingent claim.

The majority cites the legislative history to the definition of "claim" in section 102(2) to the effect that a non-recourse claim against the debtor's property "would be treated as a claim against the debtor personally for the purposes of the Bankruptcy Code." However, note should be taken of the italicized sentence which follows the cited material: *"However, it would not entitle the holders of the claim to distribution other than from the property in which the holder had an interest."* H.Rep. No. 595, 95th Cong., 1st Sess. 315, U.S.Code Cong. & Admin.News 1978, p. 6272. This would mean, on the facts before us, that appellee's claim is worth no more than $600,000 or less than half of the threshold amount for Chapter 12.

Assuming *arguendo* that it is relevant to discuss the nature of a waived and unenforceable obligation, the nature of any claim thereon should nevertheless be subject to inquiry. "Debt," as defined in the Bankruptcy code, means "liability on a claim." 11 U.S.C. § 101(11) (1982). The term "claim" has a broader meaning than debt. 11 U.S.C. § 101(4) (1982);[4] *In re Carpenter*, 79 B.R. at 320; *In re Lambert*, 43 B.R. at 918–19; *In re King*, 9 B.R. 376, 377 (Bankr.D.Or.1981); *contra, In re Energy Co–Op*, 832 F.2d 997, 1001–02 (7th

Cir.1987); *In re Pulliam*, 90 B.R. 241, 245–46 (Bankr.N.D.Tex.1988). The court in *Carpenter* expressed the consequences of this distinction well:

> A claim arising from a creditor's demand for repayment, encompasses all obligations against a debtor which may be assertible in a bankruptcy case and thereby potentially affected by the discharge. But a claim is subject to disallowance if it is not a liability cognizable under law. That liability must be established or unchallenged before a claim becomes a debt. For that reason, the debtor's good faith indication of its debts generally establishes its eligibility for relief under a specific chapter of the Bankruptcy Code rather than the assertions of creditors by way of claims. See *Comprehensive Accounting Corp. v. Pearson (In the Matter of Pearson)*, 773 F.2d 751 (6th Cir.1985). This Court would add to the finding in *Pearson* that the omission of a debt by the debtors, even if such omission is not in bad faith, but results from a mistake in law, is properly before the Court for the purpose of establishing eligibility for relief upon an appropriate challenge by a party in interest.

*In re Carpenter*, 79 B.R. at 320. Therefore, unliquidated, contingent or seriously disputed claims while subject to being counted at face value should nevertheless be subject to review for potentially commensurate enforceability.[5] Here, the

---

**4.** A claim is defined as a

    (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

    (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

11 U.S.C. § 101(4) (1982). The legislative history merely states that "[t]he terms are coextensive: a creditor has a 'claim' against the debtor, the debtor owes a 'debt' to the creditor." S.Rep. No. 989, 95th Cong., 2d Sess. 23 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5809; H.R.Rep. No. 595, 95th Cong., 2d Sess. 310 (1977), *reprinted in* 1978 U.S.Code Cong. &

Admin.News 5963, 6267. The Sixth Circuit in *Comprehensive Accounting Corp. v. Pearson (In re Pearson)*, 773 F.2d 751, 755 (6th Cir.1985) characterized this language as "imprecise."

**5.** There are two Ninth Circuit Bankruptcy Appellate Panel opinions addressing issues related to eligibility determinations under Chapter 13 which may be discussed and distinguished. *In re Wenberg*, 94 B.R. 631, 633–35 (9th Cir. BAP 1988), involved whether an attorneys' fee award in an adversary proceeding was a liquidated debt and thus affected the debtors' eligibility under the Chapter 13 debt ceiling, 11 U.S.C. § 109(e) (1982). The court held that the fees were liquidated and debtors thus ineligible. The fee reasonableness issue, however, is more in the nature of a dispute over the liquidated character and amount of the debt, rather than over its existence, and so is fundamentally dif-

claim, limited as it is to property worth only $600,000, falls far short. As discussed below, while appellee's claim far exceeds the property's present value, it is not a presently cognizable *debt* and would be subject to disallowance by the bankruptcy court to the extent that such claim exceeds the value of the property.

### D. ALLOWABILITY OF APPELLEE'S CLAIM

At the outset, 11 U.S.C. § 506(a) should be noted. In pertinent part it states:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in such property ... and is an unsecured claim to the extent of the value of such creditor's interest less the amount of such allowed claim...."

The legislative history states:

Subsection (a) of this section separates an undersecured creditor's claim into two parts. He has a secured claim to the extent of the value of his collateral; and he has an unsecured claim for the balance of his claim.

Section 506(d) provides:

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void ...

Based on the foregoing, it is clear that since appellee is undersecured, its claim may be dealt with in its discrete aspects, secured and unsecured, and that its secured claim is viable only to the extent of the value of the collateral.

However, appellee having waived recourse against the debtors, the unsecured portion of its claim cannot be allowed. The claim has no viability as an Idaho judgment, nor under the Bankruptcy Code. And, as indicated, the lien is subject to avoidance in any amount beyond the value

of the property. The effect of these provisions on Chapter 12 has been stated as follows:

The essence of Chapter 12 is the ability of the Chapter 12 debtor to "write down" the mortgage securing the farm to the value of the farm and to pay the written-down amount over time. The "write down" is accomplished through use of Code § 506(a) and (d). Code § 506(a) provides that an allowed claim is only a secured claim to the extent of the value of the collateral and is an unsecured claim for the deficiency. Code § 506(d) provides that a lien which secures a claim is void to the extent the claim is not an allowed secured claim ...

3 Norton Bankruptcy Law and Practice § 92.09

Connecticut General's claim to any amount in excess of the property's present value could not be allowed by the court, following objection by the debtors, because "such claim is unenforceable against the debtor and property of the debtor [other than the specific collateral in issue], under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1) (1982 ed. Supp. IV). Connecticut General's claim to any such excess is unenforceable because it waived its right to a deficiency; its only enforceable claim is for the property value. This issue, the basic one here, was dealt with in *In re Lands*, 85 B.R. 83 (Bankr.E.D.Ark.1988). The court considered whether the debts secured by non-recourse liens should be counted in the aggregate debt limitation. The liens had been granted by the Chapter 12 debtor on his property as an accommodation to secure his son's debts on which the debtor was not personally obligated. The court pointed out that under these circumstances, the creditor had no claim against the debtor which could be transformed into a debt, concluding:

Debtors argued that their counterclaim rendered the debt unliquidated until after trial. The court disagreed. Again, a dispute over a set-off is a dispute over the amount of a debt, rather than its existence.

ferent than the waived deficiency against the Quintanas.

The second Bankruptcy Appellate Panel case, *In re Sylvester*, 19 B.R. 671, 673 (9th Cir. BAP 1982), also concerned eligibility for Chapter 13 and whether a disputed debt was liquidated.

The claim of the three lienholders is not based on an obligation of the debtors which would be assertible in a bankruptcy case and thereby potentially affected by discharge. Their debts underlying the three claims pursuant to stipulations of the parties, are not debts owing by these debtors. Although the debtors' real estate may be clouded, they have no 'liability' on the claims, hence no debt. Therefore inclusion in the calculation of 'aggregate debt' is improper. *Lands*, p. 85.

There is a factual distinction between *Lands* and this case in that the debtor here was obligated to the creditor at the outset, whereas in *Lands* there was no personal debt at all; nevertheless, as matters now stand, this distinction is not pertinent since the debtor has no more personal obligation to the secured creditor than did the debtor in *Lands*. In both cases, at the relevant time in question, only the collateral was subject to the creditors' claims.

Debts of a family farmer, for Chapter 12 eligibility purposes, are to be determined as of the date the case is filed. *In re Carpenter*, 79 B.R. at 320; *In re Labig*, 74 B.R. 507, 509 (Bankr.S.D.Ohio 1987); *In re Orr*, 71 B.R. 639, 641 n. 4 (Bankr.E.D.N.C.1987). The date of filing is also determinative for fixing the value of Connecticut General's claim, 11 U.S.C. § 502(b) (1982 ed. Supp. IV), which in this case is the same as the value of the real property. 11 U.S.C. § 506(a) (1982). In this regard, Connecticut General's position is analogous to that of a creditor asserting a claim under a nonrecourse loan agreement. The amount of such a claim which exceeded the value of

the security would be disallowed. *In re Atlanta West VI*, 91 B.R. 620, 623 (Bankr. N.D.Ga.1988).

By way of contrast, in a Chapter 11 proceeding, such a nonrecourse deficiency claim would be allowed due to the operation of § 1111(b), which deems that a claim secured by a lien on property of the estate shall be treated the same as if the holder of the claim had recourse against the debtor. 11 U.S.C. § 1111(b)(1)(A) (1982); *In re Atlanta West VI*, 91 B.R. at 623–24; *In re Greenland Vistas, Inc.*, 33 B.R. 366, 367–69 (Bankr.E.D.Mich.1983); 5 *Collier on Bankruptcy* ¶ 1111.02 at 14 (L. King 15th ed. 1988). One of the important purposes of Chapter 12 was to eliminate the effects of § 1111(b) in farm bankruptcies so that farmers could scale their secured debts down to the value of their farms.[6] 132 Cong.Rec. S15092 (daily ed. Oct. 3, 1986) (statement of Sen. DeConcini); *see id.* at S15084 (discussion of difficulties faced by farmers under § 1111(b)). Despite the clear intent of Congress to provide exemption from section 1111(b) for farmers under Chapter 12, affirmance of dismissal here will engraft on Chapter 12 a stronger variant of section 1111(b) since it will endow the undersecured non-recourse with not simply a choice as to how to react to a debtor's Chapter 11 plan, but with power to deny the debtor any access to Chapter 12 and the opportunity to file a rehabilitative plan thereafter.

### CONCLUSION

Having waived its right to a deficiency judgment, the relief available to the creditor-mortgagee should be limited to its true

---

**6.** This aspect of Chapter 12 has been attended by some controversy and apprehension as noted by the following:

> ... it is clear that Chapter 12 has rekindled the ability of a debtor with a substantially undercollateralized mortgage debt to write down the debt to the current depressed value of his land. The debtor, under chapter 12, is allowed to keep his land, pay the former secured debtor only "liquidation value" on the newly created unsecured debt, and receive a bankruptcy discharge on the rest of the debt, while the creditor is precluded from sharing in any future reappreciation of the land. As Senator DeConcini duly noted:

> "Why won't every farmer with a substantially undercollateralized loan against his farm declare bankruptcy.... I fear that we have created a legal atmosphere that may well encourage farm bankruptcies and that farmers who can now manage to work things out with their creditors in some satisfactory manner to both will no longer have that incentive to reach mutual agreement."

Note, An Analysis of the Family Farmer Bankruptcy Act of 1986, (quoting 132 Cong.Rec. § 15092 (daily ed. Oct. 3, 1986) 15 Hofstra L.Rev. 353, 376 (1987)).

status, that of secured creditor to the extent of the value of the mortgaged property. It would be an unfortunate paradox if that part of a claim which would not be allowable in a Chapter 12 proceeding could nevertheless preclude the debtor from filing thereunder. I therefore respectfully dissent.