In re Russell L. SMITH and Joy C. Smith, Debtors.

Russell L. Smith and Joy C. Smith, Appellants,

v.

Elizabeth F. Rojas, Chapter 13 Trustee; United States Trustee, Appellees.

In re Steven Hamburg and Michelle Hamburg, Debtors.

Steven Hamburg and Michelle Hamburg, Appellants,

v.

Elizabeth F. Rojas, Chapter 13 Trustee; United States Trustee, Appellees.

BAP Nos. CC–09–1321–DMkJa, CC–09–1364–DMkJa.
Bankruptcy Nos. SV 09–13847–MT, SV 09–17343–MT.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on May 20, 2010.

Filed July 8, 2010.

Before: DUNN, MARKELL and JAROSLOVSKY,[1] Bankruptcy Judges.

## *OPINION*

DUNN, Bankruptcy Judge.

The bankruptcy court dismissed debtors' chapter 13[2] cases on the basis that the debtors exceeded the § 109(e) unsecured debt limit for chapter 13 eligibility. Asserting that the bankruptcy court erred when it included in the unsecured debt calculation the amount owed on wholly unsecured junior consensual liens, the debtors appealed. We AFFIRM.

## I. FACTS[3]

The parties in these cases are casualties of the steep decline in real property values that resulted when the so-called "Housing Bubble" burst.

### *The Smiths*

On September 20, 2006, Russell and Joy Smith purchased their California residence ("Smith Residence") for $570,000. Countrywide Home Loans ("Countrywide") financed the purchase price with a $545,000 loan to the Smiths, secured by a first position deed of trust on the Smith Residence. One year later, Washington Mutual Bank ("WAMU") loaned the Smiths an additional $250,000, secured by a second position deed of trust on the Smith Residence. One year and five days later, the Smiths filed a voluntary chapter 13 petition. In their bankruptcy schedules, the Smiths asserted the value of the Smith Residence as of the petition date was

---

**1.** Hon. Alan Jaroslovsky, U.S. Bankruptcy Judge for the Northern District of California, sitting by designation.

**2.** *Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All "Rule" or*

"FRBP" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

**3.** There are no factual disputes in these appeals.

$370,000, based on an appraisal dated October 13, 2008.[4] The outstanding balance owed to Countrywide was $547,782 pursuant to the Smiths' Schedule D filed in the case. Because the value of the Smith Residence as of the petition date was less than the amount owed to Countrywide on the first lien, the Smiths sought a determination from the bankruptcy court that they could (1) stop making payments to WAMU and (2) treat WAMU's claim as "wholly unsecured for purposes of plan confirmation." The bankruptcy court entered an order on May 15, 2009, determining that the value of the Smith Residence was $370,000, and that WAMU's claim "is undersecured for purposes of this Chapter 13 Case, such that upon confirmation of Debtors' Chapter 13 plan, [WAMU] will be treated as a general unsecured claim and paid *pro rata* with other allowed unsecured claims." In their chapter 13 plan, the Smiths proposed to treat WAMU as an unsecured creditor.

The chapter 13 trustee moved to dismiss the Smiths' bankruptcy case, or convert it to a chapter 7 case, asserting that because WAMU's claim was not secured by a lien, the debt underlying the claim must be counted as unsecured debt for purposes of chapter 13 eligibility. Adding WAMU's unsecured debt to the unsecured debt the Smiths included in their Schedule F brought the Smiths' total unsecured debt to $470,035.36, an amount that exceeded the $336,900 statutory maximum for chapter 13 eligibility. The Smiths countered that the WAMU debt remained secured, notwithstanding WAMU's treatment under the Smith Plan, both because the "strip off" occurred postpetition, and because WAMU's lien would not actually be void until the Smiths received their chapter 13 discharge. Asserting itself to be bound by the Ninth Circuit's decision in *Scovis v. Henrichsen (In re Scovis)*, 249 F.3d 975, 981 (9th Cir.2001), the bankruptcy court entered its Memorandum of Law ("Eligibility Memorandum") determining that the Smiths exceeded the unsecured debt limit for chapter 13 eligibility and granting the chapter 13 Trustee's motion to dismiss. The Smiths timely filed their notice of appeal.

Concerned that the appeal ultimately would be rendered moot by the Smiths' inability to perform any plan in the event the dismissal order was reversed, the bankruptcy court confirmed the Smith Plan and abated the dismissal order until the appeal could be decided so that the Smiths could continue making payments under the Smith Plan.[5] Further, the bankruptcy court, observing the implications on chapter 13 eligibility in a time of substantially reduced property values, certified the issue as appropriate for a direct appeal to the Ninth Circuit.

### The Hamburgs

Steven and Michelle Hamburg purchased their California residence ("Hamburg Residence") in August 2003. Flagstar Bank ("Flagstar") is the beneficial holder of the note secured by a first position deed of trust on the Hamburg Resi-

---

4. The Smiths' original Schedule D dated September 24, 2008, reflected a value for the residence of $425,000. Their amended Schedule D dated December 15, 2008, was filed to reflect the appraised value of $370,000.

5. After the Smiths filed their notice of appeal, the bankruptcy court issued an amended Eligibility Memorandum. It appears that the

purpose of the amendment was (1) to add to the caption debtor names and case numbers for two other cases already included in the discussion and to whom the Eligibility Memorandum related, and (2) to add the signatures of five additional Central District bankruptcy judges who joined in the ruling contained in the Eligibility Memorandum.

dence. Subsequently, BAC Home Loans Servicing, LP, fka Countrywide Home Loans Servicing LP ("BAC"), loaned the Hamburgs additional funds, secured by a second position deed of trust on the Hamburg Residence. On April 3, 2009, the Hamburgs filed a voluntary chapter 13 petition. In their bankruptcy schedules, the Hamburgs asserted the value of the Hamburg Residence as of the petition date was $480,000, based on an appraisal dated January 11, 2009. As set forth in their Schedule D, the outstanding balance to Flagstar was $483,988. Because the value of the Hamburg Residence as of the petition date was less than the amount owed to Flagstar on the first lien, the Hamburgs sought a determination from the bankruptcy that they could (1) stop making payments to BAC and (2) treat BAC's claim as "wholly unsecured for purposes of plan confirmation." The Hamburgs also requested that BAC's lien be "extinguished and reconveyed" upon the successful completion of their chapter 13 plan and subsequent chapter 13 discharge. The bankruptcy court entered an order on July 10, 2009, voiding BAC's consensual lien, and authorizing that BAC's claim "be treated as an unsecured claim … to be paid through the plan, pro rata, with all other general unsecured claims." The order also excused the Hamburgs from making monthly payments on BAC's note and trust deed during the pendency of the case; the Hamburgs were to be permanently relieved from making these payments "upon completion of their Chapter 13 plan and subsequent entry of the Chapter 13 discharge in the instant proceeding." In their chapter 13 plan, the Hamburgs proposed to treat BAC as an unsecured creditor.

After entering the Eligibility Memorandum in the Smith case, the bankruptcy court determined, apparently *sua sponte*, that its analysis applied to the Hamburgs'

case as well. Because the Hamburgs' unsecured debt, taking into consideration the amount of the BAC claim, exceeded the $336,900 unsecured debt limit established by § 109(e), the bankruptcy court dismissed the Hamburgs' case, but confirmed the Hamburg Plan and stayed the effectiveness of the dismissal order until resolution of this appeal. The Hamburgs timely filed their notice of appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O).

28 U.S.C. § 158(c) provides that jurisdiction over a timely appeal from a bankruptcy court order lies with this panel, unless (1) the parties make a timely election to have the appeal heard by the district court, 28 U.S.C. § 158(c), or unless the bankruptcy court has certified, inter alia, that the order appealed from involves a matter of public importance. 28 U.S.C. § 158(d)(2)(A)(i). To facilitate the direct appeal process for the issue in these appeals, the bankruptcy court stated in the Eligibility Memorandum:

> There have been a number of other cases presenting this same issue, but they have been dismissed or converted to Chapter 7 for failure to make plan payments before any ruling on the debt limits issue could be issued. Debtors making decisions about how to save their home need to know clearly before a case is filed whether Chapter 13 is a viable option or whether they must find a way to file a much more expensive Chapter 11 case. This is a matter of significant public importance in an area where foreclosure rates are at an historic high and the debt limits set by Congress do not adequately address a large

number of average home owners in financial distress.

Eligibility Memorandum at 10:6–13.

Consistent with this invitation of the bankruptcy court, the Smiths and the Hamburgs invoked Rule 8001(f)(4) and requested that the bankruptcy court certify their appeal to be heard directly by the court of appeals, which it did. However, other than requesting and obtaining the certification, neither debtors took any other necessary action to bring the appeals before the Ninth Circuit. In particular, they did not comply with Rule 8001(f)(5), which is titled explicitly "Duties of Parties After Certification." Rule 8001(f)(5) provides: "A petition for permission to appeal in accordance with Fed. R.App. P. 5 shall be filed no later than 30 days after a certification has become effective as provided in subdivision (f)(1)." The importance of complying with Fed. R.App. P. 5 cannot be overstated, because certification is only the first step in obtaining a direct appeal; the second is that the circuit court must *accept* the appeal. The Ninth Circuit explained the direct appeal process thoroughly in *Blausey v. U.S. Trustee*, 552 F.3d 1124 (9th Cir.2009), emphasizing that only if the court of appeals grants permission to appeal under Fed. R.App. P. 5 does it assume jurisdiction over the appeal.

The bankruptcy clerk properly transmitted each of these appeals to our BAP Clerk, notwithstanding the existence of the certification. *Blausey* at 1128 ("The bankruptcy court should not have sent the record to our court until we granted the petition for permission to appeal."). Thereafter, the BAP Clerk issued the briefing schedule.

In the *Smith* appeal, the Smiths brought the issue of the direct appeal certification to our attention by their motion requesting that our briefing schedule be vacated. Our motions panel granted an extension of the briefing dates, but noted that the mere existence of the certification did not suspend prosecution of an appeal before the BAP. Similarly, in the *Hamburg* appeal, the Hamburgs brought the issue of the direct appeal certification to our attention by their response to our Clerk's Notice of Deficient Appeal and Impending Dismissal, issued because the Hamburgs had not completed the record in their appeal. In this response, the Hamburgs requested that we transfer the appeal directly to the Ninth Circuit. Our motions panel denied the request that we certify the matter to the court of appeals, stating: "The bankruptcy court already made the predicate certification; Appellants did not file a timely petition for leave to appeal; it is up to the court of appeals, and not this panel, to decide whether to entertain a late petition for leave to appeal."

■ The Ninth Circuit has not granted permission for either appeal to be heard as a direct appeal; we therefore retain jurisdiction to decide these appeals pursuant to 28 U.S.C. § 158.

### III. ISSUE

Whether a debt secured by a consensual lien that is wholly unsecured under § 506(a) should be counted as unsecured debt for purposes of determining the eligibility of debtors for chapter 13 relief under § 109(e).

### IV. STANDARDS OF REVIEW

■ Eligibility determinations under § 109 involve issues of statutory construction and conclusions of law, including interpretation of Bankruptcy Code provisions, which we review de novo. *See Mendez v. Salven (In re Mendez)*, 367 B.R. 109, 113 (9th Cir.BAP 2007)(§ 109(h)); *see also Soderlund v. Cohen (In re Soderlund)*, 236 B.R. 271, 272–73 (9th Cir.BAP

1999)(whether a debt is liquidated or contingent is a question of statutory interpretation under § 109(e) which is reviewed de novo). De novo review requires that we consider a matter anew, as if it had not been heard before, and as if no decision had been rendered previously. *United States v. Silverman,* 861 F.2d 571, 576 (9th Cir.1988); *B–Real, LLC v. Chaussee (In re Chaussee),* 399 B.R. 225, 229 (9th Cir.BAP 2008).

## V. DISCUSSION

### A. *The Problem*

These appeals have arisen during the current difficult economic time which is being referred to as "The Great Recession." The collapse of the "Housing Bubble" has been identified as a significant cause of a severely depressed housing market. The Central District of California, where these appeals originate, is one region that has been particularly hard hit by the downturn in the prices of homes. In some areas, home values are a mere 50% of what they were when the home values peaked a few years ago.

During the accelerated growth of home values as the bubble was building, homeowners gained substantial equity very quickly. Many homeowners accessed that equity through credit lines or other loans secured by second and sometimes third deeds of trust on their homes. As with the Smiths and Hamburgs, many individuals find themselves owing significantly more for their homes than the homes are now worth, and are struggling to meet the substantial payment obligations incurred both to purchase their homes and for their equity borrowings.

As mortgage defaults have increased, so have bankruptcy filings. While many homeowners have walked or will walk away from their homes, others are trying to save their homes by using the provisions of chapter 13. These appeals address one major challenge faced by homeowners attempting to save their homes in chapter 13: debt limits for chapter 13 eligibility.

As relevant to these appeals involving joint debtors, section 109(e) provides:

> Only ... an individual with regular income and such individual's spouse, that owe, on the date of the filing of the petition, noncontingent, liquidated unsecured debts that aggregate less than $336,900 ... may be a debtor under chapter 13 of this title.

We are asked to determine whether, when the debt of a creditor that holds a second mortgage on a debtor's residence is wholly unsecured on the petition date, the debt constitutes unsecured debt for purposes of the § 109(e) eligibility calculation, notwithstanding that the creditor's lien has not been avoided judicially as of the petition date.

By way of background, we restate certain bankruptcy fundamentals, "The term 'debt' means liability on a claim." § 101(12). "The term 'claim' means ... right to payment, whether ... such right is ... secured, or unsecured ...." § 101(5)(A). "The term 'creditor' means ... entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor ...." § 101(10)(A). Thus, for bankruptcy purposes, the second lienholders are simply creditors who hold claims. As an independent fact, each also holds a lien, which is defined as a "charge against or interest in property to secure payment of a debt ...." § 101(37).

### B. *"Strip Off" Can Be Favorable to Chapter 13 Debtors*

■ Section 1322(b)(2) provides that a chapter 13 plan may "modify the rights of holders of secured claims, other than a

claim secured only by a security interest in real property that is the debtor's principal residence...." While this provision prohibits the "strip down" of a partially secured lien on a debtor's principal residence, it does not prohibit the "strip off" of a wholly unsecured lien. *Compare Nobelman v. American Sav. Bank (In re Nobelman)*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), *with Zimmer v. PSB Lending Corp. (In re Zimmer)*, 313 F.3d 1220 (9th Cir.2002).

■ When, as in the cases before us, a home's value has fallen to the point that the second lienholder is fully unsecured, § 1322(b)(2) allows a chapter 13 debtor to "strip off" the second lien.

The context in which "strip off" has become important to chapter 13 debtors in these "Housing Bubble" cases is in the application of § 1325(a)(5) to the lien of a wholly unsecured creditor. The requirements for confirmation of a chapter 13 plan are found in § 1325.

> With respect to secured creditors, § 1325(a)(5) requires generally that a chapter 13 plan must provide one of three alternative treatments: treatment to which the secured creditor consents; retention of collateral by the debtor with a stream of payments to the secured creditor; or surrender of the collateral to the secured creditor.

*Trejos v. VW Credit, Inc. (In re Trejos)*, 374 B.R. 210, 214 (9th Cir.BAP 2007). Thus, under § 1325(a)(5), unless the holders of allowed secured claims have consented to receiving no payments, they must receive a "stream of payments" having a present value equal to their allowed secured claims if the debtors intend to keep their residences. However, by its terms, § 1325(a)(5) applies only to an "allowed secured claim."

■ The actual lien stripping process is effectuated through § 506, which appropriately is entitled "Determination of secured status." Section 506(a) states that to be an "allowed secured claim," the prerequisite for payment under § 1325(a)(5), there must be value to which the lien of a secured creditor can attach. Thus, a determination under § 506(a) that a creditor is wholly unsecured effectively excuses debtors from treating the creditor's claim as secured under the chapter 13 plan.

■ The purpose of § 506 is "to give the [bankruptcy] court appropriate authority to ensure that collateral or its proceeds is returned to the proper creditor." H.R.Rep. No. 95–595, at 382 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5963, 6338. Under nonbankruptcy law, to be a "secured claim," a claim need only be secured by collateral of some sort; the value of the collateral does not matter, unless and until enforcement against the collateral is undertaken, at which time "the actual value of the security interest is most often determined by the enforcement procedure." 4 COLLIER ON BANKRUPTCY ¶ 506.03[4][a][i], at pp. 506–21–506–22 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.2010). "Section 506(a) operates as a substitute for enforcement in the sense of fixing the value of a secured creditor's legal entitlements associated with its security interest while avoiding the enforcement process itself so that the property may be used or disposed of in a manner consistent with the goals of the Bankruptcy Code." 4 COLLIER ON BANKRUPTCY ¶ 506.03[4][a][ii], at p. 506–23.

> Section 506(a)(1) provides that
> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such

property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

Rule 3012 implements § 506(a) by authorizing the bankruptcy court to determine the value of a claim. The Advisory Committee note to Rule 3012 explains:

> Pursuant to § 506(a) of the Code, secured claims are to be valued and allowed as secured to the extent of the value of the collateral and unsecured, to the extent it is enforceable, for the excess over such value. *The valuation of secured claims may become important in different contexts ....*

(Emphasis added.)

Appellants invoked the provisions of § 506(a) and asked the bankruptcy court to determine the value of the legal entitlements associated with second lien claims while avoiding the enforcement process of foreclosure. With the uncontested valuations Appellants presented to the bankruptcy court, the Appellants achieved their desired result: there was no value to which the liens could attach. As a consequence, the second lienholders did not hold allowed secured claims, and Appellants were allowed to treat them as general unsecured creditors in the context of their bankruptcy cases.

## C. *Implications of "Strip Off" for Chapter 13 Eligibility*

An unintended consequence of "strip off" is the impact that changing a claim's "status" from secured to unsecured can have on chapter 13 debtor eligibility under § 109(e).

6. As a matter of semantics, the Appellants prefer to characterize the second lienholders' claims as "undersecured." They attempt to create a distinction where there is no real difference. Under their respective plans, the

The Smiths and Hamburgs appear to concede that the claims of the wholly unsecured[6] second lienholders, like any other unsecured claim, will be discharged upon completion of their chapter 13 plans. *See Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36, 41 (9th Cir.BAP 1997). However, they contend that the second lienholders retain the rights of secured creditors until the moment of discharge, and therefore, their claims cannot be counted as unsecured for chapter 13 eligibility purposes.

The Smiths and Hamburgs invoked § 506(a) to determine the secured status of the second lienholder claims and obtained a determination that both claims were wholly unsecured. They assert on appeal that this is all the relief they requested, and the bankruptcy court erred when it took the further step of determining that the second lienholder claims must be counted as unsecured for purposes of chapter 13 eligibility.

### 1. *Scovis is controlling authority*

█ The bankruptcy court recognized that *Scovis v. Henrichsen (In re Scovis)*, 249 F.3d 975, 981 (9th Cir.2001), provided binding precedent for deciding that under § 506(a), the claims of the second lienholders were to be counted as unsecured claims as of the petition date for purposes of § 109(e) eligibility.

Appellants urge a "mechanical" application of *Scovis* based on the following language:

> We now simply and explicitly state the rule for determining Chapter 13 eligibility under § 109(e) to be that eligibility should normally be determined by the debtor's originally filed schedules,

Smiths and the Hamburgs treat the second lienholders as having wholly unsecured claims. As noted by the bankruptcy court, "unsecured" is the more "accurate term." Eligibility Memorandum, at p. 4 n. 5.

checking only to see if the schedules were made in good faith.

*Scovis,* 249 F.3d at 982.

We agree with Appellants that no issue was raised that their schedules were not filed in good faith. Thus, they assert, if *Scovis* is to be applied "mechanically," the bankruptcy court erred when it failed to count the second lienholder claims as secured claims simply because they were included as "Creditors Holding Secured Claims" on Schedule D, and not as "Creditors Holding Unsecured Nonpriority Claims" on Schedule F. Appellants find fault with the bankruptcy preparation software, asserting that it, not they, reduced the amount of the secured claims of the second lienholders to zero on Schedule D. *Scovis,* however, was intended to ensure a straightforward and realistic application by incorporating into eligibility determinations the concept that a debt's "status" could be as readily ascertainable as its "amount," no matter in which schedule the debt appeared. *See id.* at 984. We observe that the software conducted exactly the simple formulaic calculation that the bankruptcy court otherwise would have done manually in this case, and the Appellants attested to the accuracy of their schedules by signing them "under penalty of perjury."

*Scovis* hinged on the status of a junior judgment lien. In ascertaining the extent to which the judgment lien, included in Schedule D rather than in Schedule F, was unsecured for § 109(e) purposes, *Scovis* considered not only the scheduled value of the property, the amount of the first trust deed and the amount of the judgment lien, but also the debtors' declared California homestead exemption. The *Scovis* court determined that, because the debtors had listed both the homestead exemption and the judgment lien on the schedules, the bankruptcy court was provided a "suffi-

cient degree of certainty" to regard the entire judgment lien as unsecured for eligibility purposes. This was true even though the debtors, as in the cases before us, had not included any portion of the judicial lien as an unsecured claim on their Schedule F.

In the cases before us, both the Smiths and the Hamburgs listed in Schedule D the value of their residence and the amount owing on the first trust deed. Because the first trust deed in each case exceeded the value of the residence, the bankruptcy court had a "sufficient degree of certainty" to determine that the second liens were wholly unsecured under § 506(a). Indeed, the only reason that the second liens could be avoided in chapter 13 is because they were wholly unsecured, not undersecured. Otherwise, § 1322(b)(2), by its plain terms, would preclude modifying the rights of the second lienholders in a chapter 13 plan.

Appellants also contend that under *Slack v. Wilshire Ins. Co. (In re Slack),* 187 F.3d 1070, 1073 (9th Cir.1999), the "bankruptcy court cannot look to post-petition events to determine the amount of the debt." Appellants would have us read this phrase with "unsecured" as a modifier to "debt." However, the issue in *Slack* was whether a debt was noncontingent and liquidated, and therefore whether it should be counted at all in a chapter 13 eligibility determination. There is no dispute before us that the *amount* of the debt of the second lienholders is fixed as of the petition date; our issue is whether the debt is unsecured. Significantly, this exact issue was addressed by the *Scovis* court:

> Although [in *Slack*] we were defining the term 'liquidated' and not 'secured,' we included in the eligibility determination readily ascertainable amounts, even though liability on the debt had not been finally decided.... This principle of cer-

tainty carries equal force in the present context, where the homestead exemption's effect on the status of Debtors' debt as secured or unsecured is readily ascertainable.

*Scovis,* 249 F.3d at 984.

In the context before us, the "principle of certainty" applies where the effect of the value of the property on the status of Appellants' debts as secured or unsecured is readily ascertainable. A claim is secured only to the extent of the value of a creditor's interest in the estate's interest in such property. § 506(a)(1). Thus, the question for the bankruptcy court was, on the petition date, did the second lienholders have secured or unsecured claims for purposes of § 109(e).

Appellants appear to concede that, in light of its reliance on *Miller v. United States Through Farmers Home Admin. (In re Miller),* 907 F.2d 80 (8th Cir.1990), *Scovis* applies to at least a subset of consensual liens. In *Miller,* the formulaic calculation of unsecured debt adopted by *Scovis* was applied to a consensual lien that was secured not only by the debtor's residence, but also by farmland and farm equipment. *Id.* at 81. The only issue we see, and as raised by the Smiths and the Hamburgs, is whether the *Scovis* analysis changes because the second lien claims in these cases were consensual liens secured solely by real property that is the principal residence of the debtors. Appellants, in a

surprising inconsistency, argue that it is § 1322(b)(2) that prohibits a change in the status of the second lienholders' claims because it precludes modification of the rights of claims secured only by a debtor's principal residence to render those claims unsecured. However, that is in actuality what Appellants sought and accomplished through their motions to determine the secured status of the WAMU and BAC claims. It is disingenuous for Appellants now to assert that all § 1322(b)(2) allows is the cessation of payments during the pendency of the case. Appellants have in fact modified the rights of the second lienholders within the bankruptcy context; by operation of § 506(a), the second lienholders no longer hold secured claims for purposes of their bankruptcy cases.

### 2. Timing of lien "avoidance" does not matter

Nor are we persuaded that the *Scovis* analysis is in any way altered because the second liens may not have been avoided.[7] *Scovis* itself involved a judgment lien that had not yet been avoided. In fact, it is difficult to imagine any situation where the original schedules in a case ever would include as a secured lien, a lien that already had been avoided in the bankruptcy case.

*Scovis* instructs that determination of the "status" of a judicial lien claim as

---

7. Appellants argue at great length in their briefs that their motions before the bankruptcy court sought only to reclassify wholly unsecured deeds of trust, not to attack the validity or priority of the liens. They assert that due process requires that an adversary proceeding be filed "to determine the validity, priority, or extent of a lien or other interest in property ..." prior to actual avoidance of the wholly unsecured lien. Rule 7001(2). We need not reach this issue. For our purposes, we need only decide whether the application of § 506(a) can operate to change the status of a

claim from secured to unsecured in a bankruptcy case and whether such change impacts a § 109(e) eligibility determination. We observe that § 506(d) provides: "To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void...." Further, § 1327(c) provides: "Except as otherwise provided in the plan or the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor provided for by the plan."

secured or unsecured requires the application of § 506(a). *Id.* at 983. "[A] vast majority of courts, and all circuit courts that have considered the issue, have held that the unsecured portion of undersecured debt is counted as unsecured for § 109(e) eligibility purposes." *Id.*

Appellants assert "[the second lienholders] retain all rights and remedies under California law, as well as their security interest, and therefore are secured for purposes of section 109(e) eligibility." Appellants' Opening Brief at 17:5–7. They contend that because the second liens are not irrevocably void until the chapter 13 discharge is entered, and because their lien rights are not eliminated under California law until foreclosure, *see, e.g.,* Cal. Civ.Code § 2903, the second lienholders remain secured creditors even though they cannot enforce their rights in the collateral in the bankruptcy case.

We do not dispute that the determination of property rights by the bankruptcy court ordinarily is controlled by state law. *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). However, we disagree that merely holding a security interest on the petition date means that the creditor is a secured creditor for purposes of the Bankruptcy Code generally, or § 109(e) specifically.

> Under section 506(a), a creditor's rights in property are dependent on the bankruptcy estate's interest in property; the determination of the estate's interest is separate from and must precede the determination of the creditor's interest. If the estate has no interest in the property at issue, . . . it is not possible for the claim of [the] creditor . . . to be secured by that property under section 506(a).

*United States v. Snyder,* 343 F.3d 1171, 1176 (9th Cir.2003). While *Snyder* addressed what happened to a creditor's lien if the property to which it attached never became property of the bankruptcy estate under § 541(c)(2), it is instructive in the chapter 13 eligibility analysis: where a creditor cannot enforce its security interest in property of the estate, the creditor is precluded from "attaining secured status in the bankruptcy proceeding." *Id.* at 1179, *quoting In re Taylor,* 289 B.R. 379, 383–84 (Bankr.N.D.Ind.2003) ("[T]he fact that a creditor does not hold a lien upon property of the estate does not mean there is no underlying right to payment; only that the claim is not 'secured' in the bankruptcy sense of the word.").

## VI. CONCLUSION

Section 1322(b)(2) allows chapter 13 debtors to "strip off" from their residences wholly unsecured liens. Section 506(a) provides that an allowed "claim" of a "creditor" secured by a "lien" on "property in which the estate has an interest . . . is a *secured claim* to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an *unsecured claim* to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." Thus, by its terms, § 506(a) provides that the undersecured portion of a lien claim is an unsecured claim. Section 506(d) implements § 506(a) by providing that the lien is void as to any unsecured portion of the claim.

The bankruptcy court did no more than it was asked: it determined the secured status of the WAMU and BAC claims under § 506(a). By application of § 506(a), that portion of the claim of a secured creditor that is undersecured is an unsecured claim. Having asked the bankruptcy court to determine that the WAMU and BAC claims were wholly unsecured, and having scheduled them as such, the debtors cannot now complain because the Bankruptcy Code requires classification of

those claims as unsecured claims in their full amounts, especially where they intend to treat the second lienholders as wholly unsecured creditors for all purposes under their plans.

The bankruptcy court correctly determined that the Smiths and the Hamburgs exceeded the unsecured debt limits for chapter 13 eligibility in light of *Scovis.* Therefore, unless the Ninth Circuit revisits and alters the *Scovis* decision in this context, dismissal of the Appellants' chapter 13 cases cannot constitute error.

 Chapter 13 debt limits are mandated by statute. Bankruptcy courts are required to apply the provisions of the Bankruptcy Code as they are written. To the extent the existing chapter 13 debt limits are too low to provide chapter 13 relief to homeowners impacted by the current economic climate, that is a matter within the purview of Congress.

We AFFIRM.

JAROSLOVSKY, Bankruptcy Judge, concurring:

The decision of my brethren is a proper application of binding case law, and I accordingly concur. I write separately only to point out that the confluence of new circumstances and old cases has created a perfect Catch–22 [8] for the Smiths and the Hamburgs: they are ineligible for chapter 13 because they need the relief afforded by

chapter 13, and would be eligible if they did not need the relief.

I begin by noting that we are declaring ineligible debtors who were clearly intended by Congress to be eligible for chapter 13 relief. They are solid middle-class wage earners. When Congress fashioned the debt limits set forth in § 109(e) of the Bankruptcy Code, it had in mind debtors who owned a middle-class residence with, typically, a first and second mortgage, a vehicle loan or two, and a significant but not excessive amount of unsecured debt, typically credit card obligations.[9] I quite agree that courts cannot create eligibility where none has been intended by Congress. *Quintana v. Internal Revenue Service (In re Quintana),* 107 B.R. 234, 241 (9th Cir. BAP 1989). However, in this case we are taking away eligibility which Congress intended. Eligibility for chapter 13 should be liberally interpreted so as not to unnecessarily obstruct the eligibility of debtors desiring relief. *In re Lambert,* 43 B.R. 913, 919 (Bankr.D.Utah 1984). This is especially the case when the debtors seeking relief are exactly the kind of debtors Congress had in mind when fashioning eligibility.

The only meaningful relief under the Bankruptcy Code for debtors caught in the mortgage crisis is the ability, in some chapter 13 cases, to remove junior encumbrances from their home. For most of these debtors, the complexity and expense

---

8. The term "Catch–22" is familiar to those of a certain age who remember the 1961 black satire of that title by Joseph Heller. Set in World War II, it described army regulations which purported to allow a bomber pilot driven to insanity by the dangers of combat to request relief, but also specified that concern for one's safety in the face of dangerous combat was the process of a rational mind. Thus, anyone who asked to be relieved was by definition sane and not eligible to be relieved.

9. A review of the legislative history of § 109(e) makes it clear that the dollar amounts were deemed necessary by Congress because chapter 13 was being opened to small businesses, a major change from old chapter XIII which was limited to wage earners. The limitations were deemed necessary to keep businesses out of chapter 13 which were more properly reorganized in chapter 11. 9 Bkr.L.Ed, Legislative History § 82:4. Congress clearly did not intend the limits to keep ordinary middle class wage earners out of chapter 13.

of a chapter 11 case is beyond their means. My sense of fairness and the depth of the crisis lead me to look for a way to make chapter 13 available to debtors like the Smiths and the Hamburgs.

We are expected by the Court of Appeals to follow the decisions of other circuits in most instances. *United States v. Battley (In re Berg)*, 188 B.R. 615, 620 (9th Cir.BAP1995). This direction requires my concurrence. However, the Court of Appeals has the power to distinguish its prior decisions and consider whether it should follow those of other circuits. I believe that such an approach to the issue of chapter 13 eligibility would be wise.

The Smiths and Hamburgs have been declared ineligible because *Scovis v. Henrichsen (In re Scovis)*, 249 F.3d 975 (9th Cir.2001) and *Miller v. United States (In re Miller)*, 907 F.2d 80 (8th Cir.1990), require the court to add some debt secured by a mortgage to the unsecured debt total. These two cases, combined with an unforeseen and unprecedented drop in home values, have created an impediment to chapter 13 relief certainly not within the contemplation of Congress in 1978.

*Scovis* is readily distinguishable on its facts. That case found that a debt: (1) which began as unsecured, (2) became secured by legal process, and (3) was readily returnable by operation of law to unsecured status, should be treated as unsecured for eligibility purposes. In that case, the intent of Congress was clearly honored; an unsecured debt was treated as such notwithstanding its fleeting status as technically secured. If *Scovis* were the only applicable case, I would urge that it be distinguished on that ground. However, *Miller* represents a more serious hurdle, as the Smiths and Hamburgs cannot prevail unless a conflict between the circuits is created.

In most instances, revisiting a more or less settled issue of law is not sound policy. However, this instance is the exception because application of *Miller* to the current situation creates losers without any winners. In the Smiths' case, it was the chapter 13 trustee who sought dismissal. In the Hamburgs' case, the court apparently raised the issue on its own. In neither case did the junior deed of trust holder object to avoidance of its lien; economic circumstance, not bankruptcy law, has rendered the liens worthless. It is purposeless to the point of cruelty to maintain a rule of law which benefits nobody, does only harm and severely limits the availability of a salutary law.

If I were free to visit the issue anew, I would hold that for chapter 13 eligibility purposes ordinary residential mortgage debt is properly treated as secured notwithstanding the current value of the collateral. Because I feel bound by *Miller*, I must concur in a different result.