NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

In re:
ANNA STAHL,

        Debtor.

---

EMCYTE CORP.,

        Appellant,

v.

ANNA STAHL,

        Appellee.

BAP No.  CC-20-1254-SGF

Bk. No.  2:20-bk-11739-WB

**MEMORANDUM**[1]

Appeal from the United States Bankruptcy Court
for the Central District of California
Julia Wagner Brand, Bankruptcy Judge, Presiding

Before: SPRAKER, GAN, and FARIS, Bankruptcy Judges.

## INTRODUCTION

Appellant EmCyte Corp. appeals the bankruptcy court's order

confirming debtor Anna Stahl's chapter 13[2] plan over its objection that

Stahl's unsecured debt exceeded the limits allowed under § 109(e). Emcyte

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

argues that the bankruptcy court erred by not including the stated amount of its proof of claim when calculating Stahl's unsecured debt for eligibility purposes.

On the record before us, the bankruptcy court did not abuse its discretion by relying exclusively on the schedules to calculate Stahl's chapter 13 eligibility. Similarly, we reject EmCyte's argument that the bankruptcy court was bound to include the stated amount of its proof of claim in determining Stahl's chapter 13 eligibility because Stahl did not object to its claim.

Accordingly, we AFFIRM.

## FACTS

**A.    Stahl's initial schedules, statement of financial affairs, and plan.**

Stahl commenced her chapter 13 bankruptcy in February 2020. In her schedules and statement of financial affairs, she disclosed that she was the principal of two companies – XLmedica, Inc. ("XLmedica") and Lifeform Healing Research LLC ("Lifeform").

In her initial schedules, Stahl listed $47,975.80 in priority unsecured debt and $127,714.79 in nonpriority unsecured debt for a grand total of $175,690.59 in unsecured debt. None of this amount was listed as contingent or unliquidated. Also, none of this amount was attributable to anything she might owe to EmCyte. Stahl listed EmCyte in three different entries in her schedule E/F, but she stated no specific fixed amount of debt in any of these entries. In the first entry, she listed the amount of EmCyte's

2

claim as "$0.00" and provided the following additional information: "Debt of $135,000 owed exclusively by [Lifeform], Debtor's now defunct business (closed 2018); notice only" (the "Notice Only Claim"). Stahl listed the Notice Only Claim as disputed, but she did not check the boxes for contingent or unliquidated.

In the second entry naming EmCyte as a creditor, she listed the amount owed as "unknown" and further stated as the basis of the claim: "EmCyte Corp. v. Apex Bilogix, et al; Case No. 2:19-cv-00769-JES-NPM; trademark infringement allegations" (the "Trademark Claim"). Stahl listed the Trademark Claim as disputed, but she did not check the boxes for contingent or unliquidated.

In the third entry naming EmCyte as a creditor, she listed the amount owed as "unknown" and further stated as the basis of the claim: "EmCyte Corp. v. Lifeform Healing Research, LLC et al; Case No. 19-CA-005819; breach of contract allegations" (the "Breach of Contract Claim"). Stahl listed the Breach of Contract Claim as disputed, but again she did not check the boxes for contingent or unliquidated.

Stahl filed her initial chapter 13 plan in March 2020. She proposed a five-year plan, with monthly payments of $1,091.00 per month. She estimated that this would result in payment of $1,868.70 on account of $127,714.79 in general unsecured claims, for a distribution of roughly 1.4%. The remaining balance of plan payments of $63,591.30 would be used to pay trustee's fees and administrative and priority creditors.

**B.     EmCyte's relief from stay motion and its underlying litigation against Stahl and others.**

In April 2020, EmCyte moved for relief from the automatic stay.[3] EmCyte sought to modify the stay to permit two lawsuits involving Stahl to proceed in the non-bankruptcy courts in which they were pending. In the process of explaining why it needed relief from stay, EmCyte admitted that its claims arising from the two lawsuits were unliquidated:

> EmCyte seeks modification of the automatic stay to adjudicate its claims against Anna Stahl and XLMedica up to the point of final judgment **in order to liquidate its claim amounts**. EmCyte will look to the respective Estates for any recoveries.

(Emphasis added.)

Of the two lawsuits discussed in the relief from stay motion, one is the federal trademark and unfair competition action referenced above as the Trademark Claim. EmCyte attached to its relief from stay motion as exhibit A its trademark and unfair competition complaint. Generally speaking, EmCyte alleged that Stahl, her wholly-owned corporation XLmedica, and others conspired to unfairly compete with EmCyte and to infringe on its trademark rights by selling blood concentrating products, or

---

[3] EmCyte's relief from stay motion was not included in the parties' excerpts of record. We exercise our discretion to take judicial notice of the relief from stay motion and all other documents filed in Stahl's bankruptcy case. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

similar products, that bear EmCyte's registered "PURE" trademarks or similar marks.

The trademark and unfair competition complaint does not specify what amount Stahl owes EmCyte for her allegedly wrongful acts. Instead, the complaint contemplates that damages will be determined at trial.

The second lawsuit discussed in EmCyte's relief from stay motion is the Florida state court action referenced above as the Breach of Contract Claim. EmCyte attached to its relief from stay motion as exhibit D a copy of its state court complaint. In it, EmCyte alleges causes of action against Stahl, Lifeform, and XLmedica for accounting, fraud, breach of contract, usurpation of corporate opportunities, alter ego, and misappropriation of trade secrets. But the heart of that complaint is EmCyte's contention that Stahl both individually and through Lifeform and XLmedica breached her distributorship agreement with EmCyte by competing for direct sales with EmCyte. The complaint also alleges that Stahl and her affiliated entities misappropriated EmCyte's trade secrets and sold to customers products manufactured by EmCyte's competitors.

Like its trademark and unfair competition complaint, EmCyte's state court breach of contract complaint does not specify an amount of damages but instead contemplates that the damages amount will be determined at trial.

EmCyte additionally referenced a third lawsuit. It attached the findings of fact, conclusions of law, and judgment from this third lawsuit

5

as exhibit E to its relief from stay motion. The lawsuit, however, did not include Stahl as a party. Rather, EmCyte obtained a Florida state court judgment against a business associate of Stahl's named Emery Smith. The judgment includes findings of fact and conclusions of law regarding Smith's misconduct, which overlap with the alleged misconduct of Stahl, LifeForm, and XLmedica as stated in the breach of contract lawsuit and the trademark infringement lawsuit.

In the process of rendering judgment against Smith in this third lawsuit, the state court made a number of findings involving Lifeform. As best we can discern from the record, Lifeform was not a named party in this third lawsuit, and no judgment was entered against it. Neither Stahl nor XLmedica were parties to the action involving Smith. Even so, the state court stated in its findings that Lifeform owed EmCyte a total of $312,434.07. That amount is the sum of: (1) $147,739.07 owed based on Lifeform's procurement and sale of EmCyte products; and (2) an additional $164,695.00 owed based on Lifeform's conversion of EmCyte's direct sales customers.

In June 2020, the bankruptcy court entered an order granting EmCyte's relief from stay motion.

## C. EmCyte's proof of claim.

Around the same time EmCyte moved for relief from the stay, it also filed a proof of claim. EmCyte filed an unsecured claim for $312,434.07, the same amount found – but not adjudged – against Lifeform in the third

6

lawsuit. The exhibits attached to EmCyte's proof of claim largely mirror those attached to its relief from stay motion.

EmCyte explained that its proof of claim was based on the complaints from its federal trademark and unfair competition lawsuit and from its state court breach of contract lawsuit. While there is some overlap between these two lawsuits and the third lawsuit against Smith, neither the defendants nor the misconduct alleged completely overlap. More importantly, there is nothing in these complaints or anywhere else in the record fixing the amount of damages Stahl might owe EmCyte individually or as an alter ego of Lifeform and XLmedica.

**D.    The objections to Stahl's plan.**

In July 2020, the chapter 13 trustee objected to Stahl's plan. The trustee raised several concerns, some pertaining to the reasonableness and necessity of Stahl's claimed expenses and others pertaining to her reporting of her taxes, her income, and the finances of XLmedica.

In September 2020, EmCyte objected to Stahl's plan. EmCyte joined in the trustee's objections but also stated a few of its own. According to EmCyte, Stahl was not allocating all of her disposable income to her proposed plan and instead was diverting funds from XLmedica to her sisters, which funds should have been paid instead to Stahl and made available for a larger distribution to her unsecured creditors.[4] EmCyte

---

[4] The bankruptcy court overruled these objections. EmCyte has abandoned them on appeal, so there is no need to further address them.

7

asserted that Stahl's handling of XLmedica's funds amounted to bad faith for purposes of Stahl's chapter 13 plan.

But EmCyte mainly argued that Stahl's unsecured debts exceeded § 109(e)'s unsecured debt eligibility limit. According to EmCyte, the combined unsecured claims reflected in Stahl's schedules and in the claims register – including EmCyte's $312,434.07 proof of claim – demonstrated that Stahl had total unsecured claims exceeding $500,000.00. EmCyte pointed out that § 109(e) capped the eligibility limit at $419,275.00 in noncontingent, liquidated, unsecured debts. In short, EmCyte contended that its $312,434.07 proof of claim was liquidated – even though it had sought relief from stay to proceed with its non-bankruptcy litigation for the specific purpose of liquidating its claim against Stahl.

EmCyte attached to its plan objection a declaration and numerous pages of exhibits. These exhibits included a copy of its proof of claim and copies of papers filed in its nonbankruptcy litigation with Stahl, Lifeform, and XLmedica.[5]

### E.    Amendment of Stahl's schedules and plan, and her reply in support of her plan.

A week after EmCyte filed its plan objection, Stahl amended her schedules and her plan. In her amended schedule E/F, Stahl now listed the

---

[5] EmCyte did not argue in its written plan objection that the stated amount of its proof of claim counted for eligibility purposes because it had not been objected to. EmCyte raised this argument for the first time at the plan confirmation hearing. The bankruptcy court implicitly rejected this argument when it overruled EmCyte's plan

Notice Only Claim as contingent, unliquidated, and disputed. She also changed the stated amount Lifeform owed for that claim from $0.00 to $312,434.07 – the same amount stated in EmCyte's proof of claim. Stahl also amended the Trademark Claim and the Breach of Contract Claim to list them both as unliquidated and disputed. Otherwise, the listing of these two claims did not change.

Stahl's amended schedules listed total unsecured debt of $455,737.85, of which $312,434.07 consisted of the disputed and unliquidated Notice Only Claim. Thus, according to Stahl's amended schedules, her noncontingent and liquidated unsecured debt amounted to $143,303.78, which did not materially differ from what she had listed in her initial schedules.

As for Stahl's amended plan, she both increased the amount of her monthly plan payments and decreased the estimated amount of her priority tax debt. As a result, she projected $61,496.11 in aggregate payments to general unsecured creditors over the life of the plan.

At the same time Stahl amended her schedules and plan, she filed a reply responding to EmCyte's objections. As Stahl explained, the amount and status of the debts set forth in her schedules was controlling and the resulting liquidated and noncontingent debts listed in her schedules was well under the § 109(e) debt eligibility limit. With respect to EmCyte's claims, Stahl pointed out that the $312,434.07 Notice Only Claim in her

objection.

9

schedules was listed as only owing by Lifeform and not by her. As for the Trademark Claim and the Breach of Contract Claim, Stahl pointed out that the amount of both was listed as unknown, and that both were unliquidated and the subject of pending litigation in which the amount owed by Stahl, if any, would need to be determined. According to Stahl, the bankruptcy court needed to rely on her schedules to determine her § 109(e) eligibility because there were no allegations or evidence suggesting that her schedules were filed in bad faith.

As for EmCyte's bad faith allegations, Stahl noted that XLmedica was a debtor in its own chapter 11 case. She pointed out that its insider payments to her sisters had been duly noticed and no one had objected to those payments. She also contended that the insider payments were both reasonable and necessary under the circumstances. In any event, she maintained that any issue regarding the propriety of the insider payments should be taken up in XLmedica's chapter 11 case.

## F. The confirmation hearing and the order confirming Stahl's plan.

The bankruptcy court held a plan confirmation hearing on September 23, 2020. The court overruled EmCyte's objections.[6] The court stated that, unless it was apparent on the face of the schedules that they were not filed in good faith, the court should and would rely on the schedules to determine Stahl's eligibility under § 109(e). As the court observed, the

---

[6] At the confirmation hearing, the trustee acknowledged that Stahl effectively had resolved all of the trustee's plan objections.

schedules reflected that Stahl did not exceed the unsecured debt eligibility limit set forth in the statute. In addition, the bankruptcy court rejected EmCyte's bad faith contention. The bankruptcy court essentially adopted Stahl's position on good faith, for the reasons stated in her reply brief in support of plan confirmation.

On October 15, 2020, the bankruptcy court entered its order confirming Stahl's plan. EmCyte timely appealed on October 29, 2020.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Did the bankruptcy court abuse its discretion by basing its § 109(e) eligibility determination solely on Stahl's schedules?

2. Even if the bankruptcy court had considered EmCyte's proof of claim, would that have demonstrated that Stahl's unsecured debt exceeded § 109(e)'s eligibility limit?

## STANDARDS OF REVIEW

We review for an abuse of discretion the bankruptcy court's decision whether or not to look beyond the debtor's schedules for purposes of § 109(e) eligibility. *See Guastella v. Hampton (In re Guastella)*, 341 B.R. 908, 918 (9th Cir. BAP 2006) (holding that "it was **properly within the discretion of the bankruptcy court** to make a limited inquiry outside of the schedules to determine first whether Guastella estimated her debts in good

11

faith and, if not, whether Guastella was in fact eligible for chapter 13 relief." (emphasis added)).

The bankruptcy court abused its discretion if it applied an incorrect legal standard or made factual findings that were illogical, implausible, or without support in the record. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011) (citing *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).

The effect of EmCyte's proof of claim on Stahl's eligibility turns on whether or not the claim was liquidated at the time of her bankruptcy filing. Answering that question requires interpretation of the Bankruptcy Code, which we review de novo. *Fountain v. Deutsche Bank Nat'l Tr. Co. (In re Fountain)*, 612 B.R. 743, 747 (9th Cir. BAP 2020) (citing *Nicholes v. Johnny Appleseed of Wash. (In re Nicholes)*, 184 B.R. 82, 86 (9th Cir. BAP 1995)).

## DISCUSSION

**A.     General legal standards applicable to chapter 13 eligibility.**

Section 109(e) governs who is eligible to be a chapter 13 debtor. It provides in relevant part: "Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $419,275 . . . and noncontingent, liquidated, secured debts of less than $1,257,850 . . . may be a debtor under chapter 13 of this title."[7]

---

[7] Though the dollar amounts of the debt limits under the statute are adjusted periodically, the amounts effective at the time of Stahl's chapter 13 filing were the same

The statute specifically excludes contingent and unliquidated debts from the eligibility calculation. *Ho v. Dowell (In re Ho)*, 274 B.R. 867, 871 (9th Cir. BAP 2002). A debt is contingent if one or more extrinsic events must occur before the debtor will be liable for it. *In re Fountain*, 612 B.R. at 749 (citing *Fostvedt v. Dow (In re Fostvedt)*, 823 F.2d 305, 306 (9th Cir. 1987)).

And a debt is unliquidated unless the amount of the debt is "readily determinable." *Slack v. Wilshire Ins. Co. (In re Slack)*, 187 F.3d 1070, 1073 (9th Cir. 1999). In turn, "[t]he definition of 'ready determination' turns on the distinction between a simple hearing to determine the amount of a certain debt, and an extensive and contested evidentiary hearing in which substantial evidence may be necessary to establish amounts or liability." *In re Slack*, 187 F.3d at 1073-74 (quoting *Fed. Deposit Ins. Corp. v. Wenberg (In re Wenberg)*, 94 B.R. 631, 633 (9th Cir. BAP 1988), *aff'd & adopted*, 902 F.2d 768 (9th Cir. 1990)); *see also In re Nicholes*, 184 B.R. at 89 ("The test for 'ready determination' is whether the amount due is fixed or certain or otherwise ascertainable by reference to an agreement or by a simple computation.").

Under the plain language of the statute, the amount of debt is determined as of "the date of the filing of the petition." 11 U.S.C. § 109(e). Thus, "a bankruptcy court cannot look to post-petition events to determine the amount of the debt." *In re Slack*, 187 F.3d at 1073.

Unlike contingent and unliquidated debts, disputed debts – that is debts where debtors dispute their liability – should not be excluded from

---

as stated above.

eligibility calculations solely on that basis. *In re Fountain*, 612 B.R. at 748 (citing *In re Nicholes*, 184 B.R. at 88). "On the other hand, if the dispute itself makes the claim difficult to ascertain or prevents the ready determination of the amount due, the debt is unliquidated and excluded from the § 109(e) computation." *In re Ho*, 274 B.R. at 874 (citing *In re Nicholes*, 184 B.R. at 891) (emphasis omitted).[8]

**B.**     **The bankruptcy court did not abuse its discretion by basing its eligibility determination solely on Stahl's schedules.**

It is well established in this circuit that § 109(e) eligibility issues "should normally be determined by the debtor's originally filed schedules, checking only to see if the schedules were made in good faith." *In re Scovis*, 249 F.3d at 982. However, "where **a good faith objection to eligibility** has been filed by a party in interest, the bankruptcy court can make a limited inquiry outside of the schedules to determine if the Debtor estimated her debts in good faith, and if not, whether she was eligible for chapter 13 relief." *In re Fountain*, 612 B.R. at 748 (citing *In re Guastella*, 341 B.R. at 918) (emphasis added).

Neither *Fountain* nor *Guastella* specifically defined what it means to file a "good faith objection to eligibility." But *Guastella* gave some indication what it meant in using this term. In *Guastella*, the debtor's

---

[8] As the Ninth Circuit has put it: "if the amount of the creditor's claim at the time of the filing the petition is ascertainable with certainty, a dispute regarding liability will not **necessarily** render a debt unliquidated." *Scovis v. Henrichsen (In re Scovis)*, 249 F.3d 975, 983–84 (9th Cir. 2001) (quoting *In re Slack*, 187 F.3d at 1074) (emphasis added).

chapter 13 filing followed on the heels of a state court tentative decision liquidating a debt against her parents for $495,000.00. 341 B.R. at 912. Though the state court did not finally determine the debtor's liability for that debt, it did tentatively find that "Guastella conspired with her parents to conceal the proceeds" from the sale of certain real property and tentatively held that "under California law, Guastella could be civilly liable for damages resulting from the conspiracy even though she was not a member of the conspiracy at the time of its inception." *Id.* at 917. Guastella then filed her bankruptcy to prevent the state court from ruling on her liability. *Id*. at 912, 917.

We held in *Guastella* that the bankruptcy court did not err in finding that the debtor failed to schedule the creditors' claim in good faith because the debtor admitted her knowledge of the above-referenced facts, and based on those facts, "it appeared to a legal certainty . . . that the [creditors'] claim was not $0.00 as stated on the schedules." *Id.* at 921. In the process of explaining that the bankruptcy court acted within its discretion in making "a limited inquiry outside of the schedules," *Guastella* observed that: (1) the objecting creditor objected to plan confirmation "on the grounds that Guastella was not eligible for chapter 13 relief and that the schedules were 'knowingly false'"; and (2) the debtor did not argue that the plan confirmation objection was filed in bad faith. *Id.* at 918.

*Guastella* generally acknowledged the *Scovis* rule – that § 109(e) eligibility issues normally are determined by the initial version of the

15

debtor's schedules, checking only to see if those schedules were made in good faith. *Id.* at 917. But *Guastella* reasoned that the *Scovis* rule did not apply because the creditors objected "based on eligibility and lack of good faith." *Id.* at 918. *Guastella* ultimately held that it was not an abuse of discretion for the bankruptcy court to look beyond the debtor's schedules and consider other facts in the record where the debtor had acted in bad faith in scheduling the debt owed to the creditor at "$0.00." *Id.*

Meanwhile, *Fountain* involved a debtor who scheduled a debt arising from a promissory note for $1,000.00. The creditor in *Fountain* filed a proof of claim establishing that the promissory note on which this claim was based was for a principal amount exceeding $1,000,000.00. *In re Fountain*, 612 B.R. at 747. Further, Fountain admitted that she signed the note. *Id.* at 747, 749. As the BAP in *Fountain* further pointed out, the debtor's dispute regarding the debt concerned the bank's right to enforce the note and not the amount owed under the note. *Id.* at 749. *Fountain* ultimately held that the bankruptcy court was justified in looking beyond debtor's schedules on these facts because the creditor "made a good faith objection to eligibility and asked the court to review its proof of claim" and because the proof of claim, when combined with the debtor's concession that she signed the note demonstrated "to a legal certainty that [the creditor's] claim was not $1,000 as stated in Debtor's schedules." *Id.*[9]

---

[9] EmCyte also relies on *Soderlund v. Cohen (In re Soderlund)*, 236 B.R. 271, 273 (9th Cir. BAP 1999). *Soderlund* pre-dates *Scovis* and seems to reject *Comprehensive Accounting*

Neither *Fountain* nor *Guastella* stands for the proposition that a bankruptcy court **must** consider facts outside the schedules in the absence of specific, concrete allegations that the debtor has, in bad faith, scheduled her debts in order to fall within § 109(e)'s eligibility limits, and without presenting some evidence to support those allegations. Nor are we aware of any such cases from this Panel or the Ninth Circuit.

As a practical matter, prohibiting the bankruptcy court from exercising its discretion, when appropriate, to curtail the eligibility inquiry would fly in the face of the principle that chapter 13 eligibility determinations need to be made expeditiously and should not be permitted

*Corp. v. Pearson (In re Pearson)*, 773 F.2d 751, 757 (6th Cir. 1985) -- the primary case on which S*covis* based its rule regarding how chapter 13 eligibility should be determined. *See In re Scovis*, 249 F.3d at 981-82. In any event, the rule *Soderlund* ultimately followed did not materially differ from the rule as articulated in *Fountain* and *Guastella*: "a bankruptcy court **may** look past the schedules to other evidence submitted when a good faith objection to the debtor's eligibility under § 109(e) is raised." *In re Soderlund*, 236 B.R. at 273 (emphasis added). Furthermore, the debtors in *Soderlund* filed multiple versions of their schedules, stating drastically different amounts of non-contingent, liquidated unsecured debt. In fact, in the initial version of their schedules, the debtors in *Soderlund* listed their aggregate unsecured debt at $500,000.00, none of which was listed as contingent or unliquidated. *Id.* at 272. This amount was well beyond the § 109(e) eligibility limit. Though the debtors later amended their schedules to reduce their contingent and unliquidated debt to $30,000.00, the initial scheduling of their debt above the § 109(e) eligibility level, by itself, would seem to provide sufficient indicia that subsequent amendments of the debtor's schedules might have been filed in bad faith as to permit the bankruptcy court to conduct a limited inquiry beyond the debtor's schedules for purposes of determining chapter 13 eligibility. *See In re Smith*, 419 B.R. 826, 829 (Bankr. C.D. Cal. 2009), *aff'd sub nom.*, *Smith v. Rojas (In re Smith)* 435 B.R. 637 (9th Cir. BAP 2010) (citing *Soderlund* and stating that a bankruptcy court "may look beyond the schedules if there are allegations **or indicia** that the schedules were not filled out in good faith" (emphasis added)).

to dominate the chapter 13 case. We have followed this principle where it appeared "to a legal certainty" that the debtor had manipulated the amounts listed in her schedules in order to fall within § 109(e)'s eligibility limits. *See In re Guastella*, 341 B.R. at 921.

Similarly, we also have stated:

> When a party challenges a debtor's eligibility for Chapter 13 relief, the bankruptcy court needs to make a prompt and effective determination of a debtor's eligibility. Failure to promptly and effectively determine the debtor's eligibility results in a waste of judicial resources and inefficient administration of a case— contravening the legislative intent for expedient resolution of Chapter 13 cases.

*In re Nicholes*, 184 B.R. at 87.

These same types of concerns led the Sixth Circuit in *Pearson* to adopt for § 109(e) eligibility purposes the approach utilized in diversity cases to resolve disputes regarding whether the amount claimed by the plaintiff met or exceeded the floor for federal diversity jurisdiction: "the amount claimed in good faith by the plaintiff controls unless it appears to a legal certainty that the claim is for less than the jurisdictional amount or the amount claimed is merely colorable." *In re Pearson*, 773 F.2d at 757 (citing *St. Paul Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-90 (1938)).

At bottom, the exigencies of chapter 13 practice and the strong need for prompt and efficient § 109(e) eligibility determinations militate in favor of a rule that affords the bankruptcy court with broad discretion to rely exclusively on the debtor's schedules. Based on our analysis of the

decisions discussed above, such exclusive reliance does not constitute an abuse of discretion unless a creditor (or the trustee): (1) objects on eligibility grounds; (2) alleges in good faith that the debtor's **schedules** were filed in bad faith; and (3) points to or presents concrete, specific evidence indicating that the debtor manipulated the scheduled debt amounts in order to fall within § 109(e)'s debt limits.

Here, EmCyte failed to make the requisite allegations and failed to point to or present the requisite evidence. In fact, the evidence in the record supports the view that Stahl did not overreach in the way she characterized EmCyte's claims in her schedules. If any party is overreaching in this matter, it is EmCyte. It sought and obtained relief from the automatic stay based on its contention that its claims against Stahl were unliquidated**.** Then, it objected to Stahl's plan on eligibility grounds based on the exact opposite contention – that its claims against Stahl were liquidated. The bankruptcy court did not abuse its discretion by relying on Stahl's schedules to determine her eligibility to be a chapter 13 debtor.

**C.  Consideration of EmCyte's claim does not establish that Stahl's unsecured debts exceeded § 109(e)'s eligibility limits.**

Even if we were to consider EmCyte's proof of claim, the claim does not establish that Stahl's liquidated, noncontingent, unsecured debts exceeded § 109(e)'s eligibility limits. Indeed, EmCyte's argument to the contrary fails as a matter of binding BAP precedent.

19

In its appeal brief, EmCyte argues that its claim should have been treated as liquidated in the amount of $312,434.07 solely because it filed a proof of claim for that amount and Stahl had not objected to its claim as of the time of plan confirmation. As EmCyte notes, Rule 3001(f) governs the evidentiary effect of duly-filed proofs of claim. Under this rule, EmCyte points out that its proof of claim constitutes prima facie evidence of the validity and amount of its claim. Therefore, EmCyte concludes that under Rule 3001(f) its claim was liquidated for eligibility purposes in the amount stated in the proof of claim.

That a proof of claim filed in accordance with the Rules constitutes prima facie evidence of the validity and amount of the claim is well established. *See Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000). Moreover, "[a] proof of claim is deemed allowed unless a party in interest objects." *Id.* (citing § 502(a)). But Rule 3001(f) solely pertains to the claims filing process. There generally is no deadline for filing claim objections in bankruptcy cases. *Ashford v. Consol. Pioneer Mortg. (In re Consol. Pioneer Mortg.)*, 178 B.R. 222, 225 (9th Cir. BAP 1995), *aff'd*, 91 F.3d 151 (9th Cir. 1996) (table) (stating that "an objection to a proof of claim may be filed at any time"); *see also Morton v. Morton (In re Morton)*, 298 B.R. 301, 309–10 (6th Cir. BAP 2003) ("Neither the Bankruptcy Code nor Bankruptcy Rules contain a bar date or deadline for filing objections to claims in a chapter 13 case and we will not read one into the law where none exists.").

More importantly, the claims filing process necessarily occurs postpetition. It, therefore, has nothing to do with chapter 13 eligibility which is measured as of the date of the filing of the petition. *In re Slack*, 187 F.3d at 1073. For this very reason, this Panel previously rejected a virtually identical argument in a prior case. *See In re Ho*, 274 B.R. at 871 n.5 (stating that court could not look at postpetition events and hence rejecting the argument that debt must be counted for eligibility purposes when it is deemed allowed under § 502(a) (citing *In re Slack*, 187 F.3d at 1073)).

Fundamentally, EmCyte's position is unsound. Determining eligibility based on proofs of claim filed "would be a dangerous practice and improperly puts eligibility in control of the creditor." *Lantzy v. Rojas (In re Lantzy)*, BAP No.CC-10-1057-KiLPa, 2010 WL 6259984, at *6 (9th Cir. BAP Dec. 7, 2010). As *Lantzy* further observed, had Congress intended that proofs of claim be the determinative factor in whether an individual could proceed under chapter 13, it would have so specified. *Id.* (citing *In re Edwards*, 51 B.R. 790, 791 (Bankr. D.N.M. 1985)).

At oral argument before this panel, EmCyte attempted to argue for the first time that the exhibits attached to its proof of claim demonstrated that its claim was liquidated. EmCyte never made this argument in the bankruptcy court, nor did it do so in its appeal brief. Instead, EmCyte specified in its appeal brief that it was relying exclusively on the evidentiary effect of its proof of claim under Rule 3001(f) to establish its

21

liquidated claim. Indeed, EmCyte unreasonably inferred Stahl's bad faith from her decision not to object to its claim prior to confirmation.[10]

Because its appeal brief relied exclusively on Rule 3001(f) to support its liquidation argument, EmCyte effectively forfeited its belated argument that the exhibits attached to its proof of claim established that its claim was liquidated. *See Christian Legal Soc'y v. Wu*, 626 F.3d 483, 487–88 (9th Cir. 2010) (declining to address matters not specifically and distinctly argued in the appellant's opening brief); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) (same). Still, we have carefully examined the exhibits attached to EmCyte's proof of claim. They do not establish "to a legal certainty" that Stahl in bad faith mis-scheduled EmCyte's claims in order to fall within § 109(e)'s eligibility limits. *See In re Fountain*, 612 B.R. at 748–49; *In re Guastella*, 341 B.R. at 920-21. To the contrary, EmCyte's exhibits actually support Stahl's description of the amount of the claims as "unknown" and her listing of the claims as unliquidated. Far from fixing the amount of damages EmCyte allegedly incurred as a result of Stahl's conduct, the exhibits reflect that the liquidation of damages was an issue reserved for trial.

---

[10] Stahl has pointed out that no purpose would have been served by prematurely objecting to EmCyte's proof of claim when litigation was proceeding on EmCyte's complaints in nonbankruptcy courts as a result of EmCyte's relief from stay motion granted for the very purpose of liquidating its claims outside of the bankruptcy court.

Accordingly, EmCyte's proof of claim does not support reversal of the bankruptcy court's determination that Stahl's unsecured debt fell within § 109(e)'s eligibility limits.

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's plan confirmation order.[11]

---

[11] In her appeal brief, Stahl argued that EmCyte's appeal is frivolous and that she should be awarded her fees and costs pursuant to Rule 8020. We decline to consider Stahl's request because she did not file a separately-noticed motion as required by the Rule. *See Simpson v. Burkart (In re Simpson)*, 366 B.R. 64, 77 (9th Cir. BAP 2007) (citing *Tanzi v. Comerica Bank–Cal. (In re Tanzi)*, 297 B.R. 607, 613 (9th Cir. BAP 2003)).